UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ODYSSEY REINSURANCE COMPANY, a Connecticut corporation,<br><br>                          Plaintiff,<br><br>v.<br><br>RICHARD KEITH NAGBY, DIANE NAGBY a.k.a. DIANE DOSTALIK; PACIFIC BROKERS INSURANCE SERVICES, a Nevada Corporation; CAL-REGENT INSURANCE SERVICES CORPORATION, a California corporation,<br><br>                          Defendants. | Case No.: 16-cv-03038-BTM-WVG<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND MOTION FOR PRELIMINARY INJUNCTION [ECF No. 41]** |

    Plaintiff Odyssey Reinsurance Company has filed a Motion for Default Judgment against Defendants Pacific Brokers Insurance Services ("PBIS") and Cal-Regent Insurance Services Corporation ("Cal-Regent") pursuant to Federal Rule of Civil Procedure 55(b)(2). Plaintiff also seeks a preliminary injunction against Defendants Richard and Diane Nagby (collectively the "Nagbys"), Cal-Regent's and PBIS' officers and sole shareholders. The Court addresses each

motion below.

## I. FACTUAL BACKGROUND

This action arises out of the judgment entered by the United States District Court for the District of Connecticut in favor of Odyssey and against Cal-Regent in the amount of $3,200,000.00 ("Odyssey Judgment")[1]. (Second Am. Compl. ("SAC") ¶¶ 15–17.) Cal-Regent was an insurance agency that underwrote certain insurance risks on behalf of State National Insurance Company ("State National"). (SAC ¶ 18.) Plaintiff in turn reinsured State National for a certain percentage of those risks, ranging from 90%–100%. (Id.) In accordance with a series of reinsurance agreements between the parties, Cal-Regent received a provisional commission—paid in part by Plaintiff—on all policies that it underwrote for State National. (SAC ¶ 19.) At the end of each year, the provisional commissions were adjusted depending on the profitability of the business underwritten by Cal-Regent. (SAC ¶ 20.) Where the provisional commission paid by Plaintiff exceeded the amount to which Cal-Regent was entitled to after the yearly adjustment, Cal-Regent was obligated to pay the difference to Plaintiff. (Id.) By 2013, Cal-Regent owed Plaintiff $2,740,802.61 in return commissions, in part due to a lawsuit against State National that settled in February 2013. (SAC ¶¶ 21–23, 25.)

Plaintiff alleges that by early 2013, the Nagbys "understood that the amount of return commissions owing to [Plaintiff] would substantially increase" as a result of the lawsuit. (SAC ¶ 29.) Plaintiff claims that "[a]s the potential effect of the

---

[1] The parties request that this Court take judicial notice of prior court judgments and documents filed in previous court actions, documents found on Nevada's Secretary of State's website, and documents filed with California's Secretary of State. See (Pl.'s Req. for Judicial Notice ("RJN"), ECF No. 41–6.); (Def. Richard Nagby's Opp'n to Pl.'s Mot. for Preliminary Injunction, ECF No. 43-3.); (Def. Diane Nagby's Opp'n to Pl.'s Mot. for Preliminary Injunction, ECF No. 42–2.) The Court **GRANTS** the parties' requests and takes judicial notice of these exhibits. See Fed. R. Evid. 201(b)–(c); see also Rosales-Martinez v. Palmer, 753 F.3d 890, 894 (9th Cir. 2014) ("It is well established that we may take judicial notice of judicial proceedings in other courts."); Gerritsen v. Warner Bros. Entm't Inc., 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) (taking judicial notice of business entity profiles on the California Secretary State's websites).

[lawsuit] on Cal-Regent's obligation to pay return commission became clear to the Nagbys, they embarked on a plan to strip Cal-Regent of assets." (SAC ¶ 30.)

Plaintiff alleges that Mr. Nagby, with the help of Defendants Claim Technology Services Corporation ("CTS") and its Chief Executive Officer ("CEO") David Dostalik, "caused funds otherwise owing to Cal-Regent and/or to its successor PBIS to be transferred to one or more account(s) held in the name of CTS" to conceal funds from creditors including Plaintiff. (SAC ¶¶ 32, 40.7.) Defendant Dostalik allegedly released to the Nagbys or for their benefit, "portions of the funds held by CTS on behalf of Cal-Regent." (SAC ¶ 33.) Some of the funds were also deposited into the Cal-Regent and PBIS operating accounts to pay creditors, "in order to deceive them as to the true status of Cal-Regent and CTS." (Id.) "Other funds deposited into the Cal-Regent or PBIS operating accounts were characterized by the Nagbys as loans to those entities, so that payments back to the Nagbys could be characterized as tax-free loan repayments." (Id.)

Plaintiff also claims that in April 2013, while Cal-Regent's debts remained outstanding, the Nagbys formed PBIS and subsequently "caused Cal-Regent to transfer substantially all of its assets to PBIS," including its goodwill and "book of business," without receiving reasonably equivalent value in exchange for these assets. (SAC ¶¶ 35–36, 45.) The Nagbys are both Cal-Regent's and PBIS's officers, directors, managers and shareholders. (SAC ¶ 46.) Plaintiff alleges that "PBIS was formed by the Nagbys for the specific purpose of continuing the business operations of Cal-Regent under a different name in order to hinder, delay or defraud the creditors of Cal-Regent." (SAC ¶ 49.)

In April 2014, Plaintiff filed an action in the District of Connecticut against Cal-Regent to recover the amount owed to Plaintiff in return commissions. (SAC ¶ 12.) In October 2015, the court rendered a judgment in Plaintiff's favor and against Cal-Regent in amount of $2,740,802.61. (SAC ¶ 14.) In November

2015, the court awarded Plaintiff a supplement judgment. (SAC ¶¶ 15–17.) In addition to the October 2015 judgment the court also awarded Plaintiff $459,197.39, bringing the judgment to a total sum of $3,200,000.00 plus interest. (Id.) Plaintiff alleges that "three months after oral argument on [Plaintiff's] motion for summary judgment in the Connecticut action and three months before the Judgment was entered, the Nagbys caused PBIS to sell substantially all of its assets to AmTrust for $5 million." (SAC ¶ 37.) AmTrust made an initial payment of $3 million which was distributed to the Nagbys. (SAC ¶ 37.)

Plaintiff now brings this action against several defendants including PBIS, Cal-Regent and the Nagbys under several theories of liability including the Uniform Voidable Transactions Act ("UVTA) and California's alter ego and successor liability law.

## II. PROCEDURAL BACKGROUND

Plaintiff filed the SAC on March 21, 2017. Cal-Regent and PBIS were served on March 21, 2017, in accordance with Federal Rule of Civil Procedure 4(e)(2)(A). (ECF Nos. 25–26.) Cal-Regent and PBIS have failed to appear or respond to the SAC. On May 31, 2017, default was entered against Cal-Regent and PBIS by the Clerk. (ECF No. 38.) On July 7, 2017, Plaintiff filed the motions at issue, seeking a default judgment and permanent injunction against PBIS and Cal-Regent, and a preliminary injunction against the Nagbys to prevent the proceeds of the AmTrust sale from being dissipated. (ECF No. 41.)

## III. JURISDICTION

When considering whether to enter a default judgment a court has "an affirmative duty to look into its jurisdiction over both the subject matter and the parties." *In Re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). Plaintiff brought this action under diversity jurisdiction, permitting the Court to exercise subject matter jurisdiction over this case. Additionally, Plaintiff alleges that Cal-Regent is a California corporation with its principal place of business within the Southern

District of California and that PBIS is a Nevada corporation with its principal place of business within the Southern District of California. (SAC ¶ 5.) The Court relies on the pleadings to find that it has personal matter jurisdiction over Cal-Regent and PBIS. *See BNSD Ry. Tyrrell*, __ U.S. __, 137 S.Ct. 1549, 1558 (2017) ("[A] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home.") (internal citations omitted).

## IV. STANDARD

**A. Default Judgment**

Entry of default judgment is governed by Federal Rule of Civil Procedure 55(b) and is left to the trial court's sound discretion. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). After default has been entered, the well-pleaded factual allegations of the complaint, except those relating to the amount of damages, shall be taken as true. *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977). In determining damages, the court can rely on evidence submitted by the plaintiff or may conduct a full evidentiary hearing. Fed. R. Civ. P. 55(b)(2). A judgment by default shall not award damages that are different from or exceed the amount requested in the plaintiff's complaint. Fed. R. Civ. P. 54(c).

Factors which may be considered by courts in exercising their discretion as to whether to enter default judgment include: (1) the possibility of prejudice to plaintiff; (2) the merits of plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure

favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986).

**B. Preliminary Injunction**

"A preliminary injunction is an extraordinary and drastic remedy." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). A plaintiff seeking a preliminary injunction or a temporary restraining order must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) where applicable, an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). Alternatively, "serious questions going to the merits and a balance of hardships can support issuance of a preliminary junction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted). Due to the exigent nature of a preliminary injunction, a court may consider hearsay and other evidence that would otherwise be inadmissible at trial. *See Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## V. DISCUSSION

**A. Default Judgment**

    **1. Eitel Factors**

The *Eitel* factors weigh in favor of granting default judgment. Cal-Regent and PBIS were properly served but have failed to respond to the SAC. Plaintiff has yet to recover the final judgment from Cal-Regent and it appears to have no other recourse but this Court's relief given that now both Cal-Regent and PBIS are left with no assets or income. There is no evidence that the default was due to excusable neglect since Plaintiff has stated facts showing that Mr. Nagby, Cal-Regent's and PBIS' CEO, has made an appearance in this action but has not

directed Cal-Regent or PBIS to appear. Therefore, whether default judgment is appropriate turns on the merits and sufficiency of Plaintiff's claims.

### 2. Sufficiency and Merits of Claims

"Upon entry of a default judgment, facts alleged to establish liability are binding upon the defaulting part . . . ." *Danning v.* Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978). The second and third *Eitel* factors require a court to assess the substantive merits of a plaintiff's claims and the sufficiently of its pleadings. *Eitel*, 782 F.2d at 1472. The Ninth Circuit has suggested that these factors require a plaintiff's allegations to "state a claim on which the [plaintiff] may recover." *Danning*, 572 F.2d at 1388. Here, Plaintiff seeks default judgment on its claim under the UVTA, California Civil Code sections 3439.04 and 3439.05, as well as under the law of successor liability. After reviewing the Complaint, the Court finds that Plaintiff has pled sufficient facts to support each cause of action.

### *i.* **Fraudulent Transfer**

"A fraudulent conveyance under the [UVTA] involves 'a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim.'" *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 829 (2005) (citing *Kirkeby v. Super. Ct.*, 33 Cal. 4th 642, 648 (2004)). Under section 3439.04(a)(1) of the UVTA a transfer is fraudulent and therefore voidable if the debtor made the transfer or incurred the obligation with "the actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ. Code. § 3439.04(a)(1). Because direct evidence of intent is uncommon, courts may consider the following factors to determine an actual intent to defraud a creditor:

> (1) Whether the transfer or obligation was to an insider; (2) whether the debtor retained possession or control of the property transferred after the transfer; (3) whether the transfer or obligation was disclosed or concealed; (4) whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) whether the transfer was

7

of substantially all the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

Cal. Civ. Code § 3439.04(b)[2]. A transfer is also voidable as to a creditor "if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Cal. Civ. Code § 3439.05.

Plaintiff alleges that nearly all of the enumerated factors are present here. For instance, the transfer of the business was made from one corporation owned by the Nagbys to another. (SAC ¶¶ 40.1, 50.1.) Though no physical assets may have been transferred, Plaintiff alleges that Cal-Regent transferred its "book of business" and goodwill to PBIS, which supports a claim of fraudulent transfer. *See Hyosung (America), Inc. v. Hantle USA, Inc.*, No. 10-02160 SBA, 2011 WL 835781, at * 5 (N.D. Cal. March 4, 2011) (finding that the plaintiff had sufficiently alleged a fraudulent transfer claim where the property allegedly transferred was the debtor's business of selling and marketing ATM machines); *see also Stoumbus v. Kilimnik*, 988 F.2d 949, 963–64 (9th Cir. 1993) (interpreting an analogous provision of the Washington Bankruptcy Code and holding that the transfer of a company's goodwill or "going concern value" could support a fraudulent transfer claim). Because both companies were managed and controlled by the same actors, the Nagbys also retained possession or control of

---

[2] The UVTA was amended by Stats. 2015, Ch. 44 which took effect on January 1, 2016. Because the transfers occurred before January 1, 2016 and the merits of this motion do not depend on the amendments, the Court relies on the language of the statute in effect during the period from 2013 to 2015.

8

the business before and after Cal-Regent's assets were transferred to PBIS. Cal-Regent allegedly concealed the transfer by "purporting to operate and conduct business as Cal-Regent even though it had been stripped of its assets." (Compl. ¶ 54.3.) Event though Plaintiff had not initiated the Connecticut lawsuit before PBIS was formed, the transfer of Cal-Regent's assets to PBIS occurred shortly after the Nagbys became aware of the substantial debt Cal-Regent would owe Plaintiff in return commissions. (SAC ¶ 54.1.) Plaintiff also claims that Cal-Regent transferred all of its assets, including its "book of business" and the goodwill it built up over 25 years of business, and left the business without the ability to satisfy its debt to Plaintiff. (SAC ¶ 54.2.) Additionally, based on Plaintiff's claim that Cal-Regent became insolvent after transferring its business to PBIS, one can reasonably infer that it did not receive "reasonably equivalent value" of the asset transferred. (SAC ¶¶ 55, 59.) These allegations are sufficient to state a claim under Cal. Civ. Code sections 3439.04(a)(1) and 3439.05.

### ii. Successor Liability

Under California law, a corporation that purchases all of the assets of another corporation is not liable for the former corporation's liabilities unless, "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Ray v. Alad Corp.*, 19 Cal.3d 22, 28 (1977). Although successor liability often refers to formal purchases, courts have extended liability to transfers of assets as well. *See Stoumbus*, 988 F.2d at 961 (interpreting Washington law and stating that successor liability can extend to "transfers other than straightforward purchases); *see also Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1327 (2012) (sustaining a jury's finding of successor liability where there was no formal purchase of assets of another corporation, but instead where a corporation which

established a separate line of business assigned leases for that businesses' equipment to another corporation). To prevail on a theory of "mere continuation," a plaintiff must show one or both of the following factual elements: "(1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." *Ray*, 19 Cal. 3d at 29.

"As with other equitable doctrines, it is appropriate to examine successor liability issues on their own unique facts and considerations of fairness and equity apply." *Cleveland*, 209 Cal. App. 4th at 1330 (internal citations omitted). Thus, the significant principle remains that "'if a corporation organizes another corporation with practically the same shareholders and directors, transfers all of the assets but does not pay all the first corporation's debts, the separate entities may be disregarded and the new corporation held liable for the obligations of the old.'" *Id.* at 1334 (quoting *McClellan v. Northridge Park Townhouse Owners Ass'n*, 89 Cal. App. 4th 746, 753 (2001)).

Here, Plaintiff does not allege that PBIS formally purchased Cal-Regent's assets. Instead, Plaintiff alleges that because Cal-Regent transferred its "book of business" and goodwill to PBIS, it is a "mere continuation" of Cal-Regent and should therefore assume its liabilities. The Court finds that taking the allegations as true, Plaintiff has sufficiently established this claim. As already discussed above, Plaintiff has pled that PBIS did not pay adequate consideration for the transfer of assets and that both corporations were operated and managed by the Nagbys. Moreover, having found that Plaintiff has adequately pled actual and constructive fraud under Cal. Civ. Code sections 3439.04(a)(1) and 3439.05, its successor liability claim survives under the "fraudulent purpose" theory as well.

Accordingly, Plaintiff has established a case on the merits for its claims against PBIS and is entitled to a default judgment under both the UVTA and

successor liability.

**3. Damages**

Plaintiff requests that the Court award the full amount it is owed under the Odyssey Judgment, $3,200,000.00 plus post-judgment interest at a legal rate from November 9, 2015 pursuant to 28 U.S.C. § 1961, as well as injunctive relief against dissipation of the Amtrust sale proceeds.

Under the UVTA, a creditor may bring an action to void a fraudulent transaction to the extent necessary to satisfy its claim. Cal Civ. Code § 3439.07(a)(1). To the extent a transfer is voidable, a "creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less." Cal Civ. Code § 3439.08(b)(1). A judgment may be entered against "[t]he first transferee of the asset or the person for whose benefit the transfer was made," as well as "[a]n immediate or mediate transferee of the first transferee." § 3439.08(b)(1)(A)-(B). A creditor may also bring an action for injunctive relief "against further disposition by the debtor or a transferee, or both, of the asset transferred or other property of the transferee." § 3439.07(a)(3)(A).

Here, Plaintiff is entitled to recover the Odyssey Judgment from PBIS in the amount of $3,200,000.00 plus post-judgment interest at a legal rate from November 9, 2015 pursuant to 28 U.S.C. § 1961. Additionally, because justice so requires, a permanent injunction is warranted so as to prevent disposition of the remaining assets. The injunction shall prohibit PBIS and Cal-Regent from distributing any remaining proceeds from its sale to Amtrust.

**B. Preliminary Injunction**

Plaintiff seeks a preliminary injunction against the Nagbys to prevent them from disposing of any funds or property in their possession which are proceeds of the AmTrust sale. The Court addresses the merits of Plaintiff's request below.

//

### 1. Likelihood of Success of the Merits

First, Plaintiff must establish a likelihood of success on the merits of its fraudulent conveyance claim under the UVTA. *See Winter*, 555 U.S. at 20.

As already discussed above, Section 3439.04 of the UVTA enumerates factors that are "regarded as circumstantial 'badges of fraud' that are probative of intent.'" *In re Beverly*, 374 B.R. 221, 235 (B.A.P. 9th Cir. 2007). Plaintiff argues that these factors demonstrate that the Nagbys personally acted with the "intent to prevent a creditor from reaching that interest to satisfy its claim." *Filip*, 129 Cal. App. 4th at 829 (internal citations omitted).

First, from the evidence, Plaintiff has established a substantial likelihood that Cal-Regent fraudulently transferred its assets to PBIS under both sections 3439.04 and 3439.05 of the UVTA. As to the Nagbys' personal liability, under the UVTA a judgment may be entered against transferees or against "the person for whose benefit the transfer was made." Cal. Civ. Code. § 3439.08(b)(1). Here, Plaintiff moves against the Nagbys as persons for whose benefit the transfer was made. Plaintiff alleges and submits evidence that they have received proceeds of the sale to AmTrust—a sale of fraudulently transferred assets from Cal-Regent to PBIS. While in most cases the only beneficiaries of a fraudulent transfer are debtors who avoid their creditors, in the case of a closely held corporation, it is reasonable to infer that the sole shareholders and officers of the corporation stood to benefit from the fraudulent transfer. *See Qwest Commc'ns Corp. v. Weisz*, 278 F. Supp. 2d 1188, 1191 (S.D. Cal. 2003) (holding that a creditor could obtain a judgment under the UFTA against the majority shareholder of a debtor corporation that had fraudulently transferred corporate assets to the shareholder's father); *see also Oracle Am., Inc. v. Appleby*, No. 16-cv-2090-JST, 2016 WL 5339799, at *9 (N.D. Cal. Sept. 22, 2016) (holding that the co-owners of the "selling" and "buying" corporations, who forced the alleged fraudulent transfer, could be held liable under the UVTA as persons for whose

12

16-cv-03038-BTM-WVG

benefit such transfer was made).

Second, Plaintiff has submitted an email exchange between Mr. Nagby and Mr. Dostalik which Plaintiff argues is direct evidence of an intent to hinder, delay, and defraud it so that it could not collect its debt from Cal-Regent. The emails of May 19, 2014 include in relevant part:

> Richard Nagby @ Pacific Brokers [9:55 a.m.]:
>
> that's [their] stupid threat to make a motion to the court means written declarations of what the money is where it comes from and [make] a permanent public record that will tell Odyssey re and State national that we have another source of [income] to pay them off . . . the money should get [distributed] quietly through CTS . . .
>
> Richard Nagby @ Pacific Brokers [11:35 a.m.]:
>
> do you really want state national/odyssey Re/Knight/Corpeointe knowing about this source of income? Do you see why this should be a private matter not a public one in the court house? And why you [don't] want anyone tracing funds from CTS to cal regent? without proper documentation?

(Decl. of James J. Reardon in Supp. of Pl.'s Mot. for Prelim. Inj. ("Reardon's Decl."), Ex. 14, ECF No. 41–4.)

These emails raise the likelihood that the Nagbys acted with the intent to hinder or delay Plaintiff from recovering from Cal-Regent. Finally, Plaintiff has demonstrated that instead of directing Cal-Regent to pay Plaintiff, the Nagbys began taking money from the business, transferring it to CTS, and then transferring it to themselves. This too raises the likelihood that Plaintiff would succeed on the merits under the UVTA.

In response to Plaintiff's motion, Mrs. Nagby argues that there is no evidence she did anything to assist in hindering, delaying or defrauding Plaintiff in its efforts to collect its debt from Cal-Regent. In fact she argues that Mr. Nagby unilaterally and without her knowledge or consent opened PBIS. Mr.

Nagby disputes Mrs. Nagby's alleged passive participation, arguing that she managed Cal-Regent's finances. Mr. Nagby also argues that he started PBIS for legitimate purposes, namely his desire to begin a new, virtual online company that contracted with Corepointe instead of State National. Notwithstanding these disputes, the Court finds that Plaintiff has established a likelihood of success on the merits or at a minimum, has raised serious questions on the merits. *See Alliance*, 632 F.3d at 1131.

### 2. Likelihood of Irreparable Harm

Second, Plaintiff must show that it is likely to suffer irreparable harm in the absence of the order. "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Courturier*, 572 F.3d at 1085 (citing *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 1067, 1085 (9th Cir. 2009)). A court may also issue an injunction freezing assets where a plaintiff demonstrates that a "defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment." *In re Estate of Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994). Although generally a preliminary injunction may not be issued to preserve assets to which a party does not yet have a legal claim, the Supreme Court and Ninth Circuit have specifically exempted instances of fraudulent conveyances and bankruptcy from this rule. *See In re Focus Media Inc.*, 387 F.3d 1077, 1085 (9th Cir. 2004) (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 312 (1999)); *see also Wimbledon Fund, SPC Class TT v. Graybox, LLC*, 648 Fed. Appx. 701, 702 (9th Cir. 2016) (upholding a preliminary injunction in a fraudulent conveyance case and one in which the plaintiff sough equitable relief).

PBIS has sold all of its assets to AmTrust, which has already paid PBIS $3 million in cash. (Decl. of Dean Kirby in Supp. of Pl.s' Mot. for Prelim. Inj. ("Kirby's Decl."), Ex. 38, 18, ECF No. 41–5.) In accordance with a stipulated

agreement in the Nagby's divorce action, these proceeds were immediately distributed to them individually. (Pl.'s RJN, Ex. 22, 2, ECF No. 41–6.) Mrs. Nagby received $2.5 million and Mr. Nagby received $500,000. (Id.) The remaining earn out payments are being paid to Mr. Nagby. (Kirby Decl., Ex. 38, 18) Plaintiff argues that these proceedings, both the lump sum and remaining earn out payments, are proceeds of the fraudulently transferred Cal-Regent assets and that without an injunction, it will be unable to recover its judgment against Cal-Regent and now, PBIS. The Court finds that there is a substantial danger that Defendants may continue to transfer or dissipate the funds they have received from the sale if the injunction were denied, resulting in denying recovery to Plaintiff. Thus, this factor tips strongly in favor of Plaintiff.

### 3. Balance of the Equities

Plaintiff argues that the balance of equities tips in favor of granting it a preliminary injunction because if the Court does not, there may not be any assets from which it could collect its judgments against Cal-Regent and PBIS. In response, Mr. Nagby argues that to go "after the divorced Nagbys at this point is not an equitable result when the plaintiff knew all along the minimal financial strength of Cal-Regent." (Def. Richard Nagby's Opp'n to Pl.'s Mot. for Preliminary Injunction, ECF No. 43, 12.) He argues that Plaintiff knew that it was working with a small family business and that it could have "demanded personal guarantees from the Nagbys or, at any time could have cancelled their contract with Cal-Regent unless the contingent commissions were held in trust or segregated from Cal-Regent's operating income . . . ." (Id.) The Court, however, is not persuaded by Mr. Nagby's assumption of risk argument and finds that the balance tips in Plaintiff's favor.

Plaintiff is a judgment creditor that seeks equitable relief to preserve its right to recover what it is owed. It was unable to recover from Cal-Regent and is now unable to recover all of its claim from PBIS, since PBIS has already

distributed the majority of the proceeds from the Am-Trust sale to the Nagbys and no longer has any income. In contrast, the Nagbys will suffer minimal harm by not immediately reaping the benefits of the sale. In fact, given their stipulation, if the earn out payments to Mr. Nagby fall short of the projected amount in any year then Mrs. Nagby will have to make up one half of the short fall for that year. As Plaintiff points out, the payouts the Nagbys received remain contingent on what AmTrust ultimately pays PBIS. Thus, they are nevertheless prevented from dissipating those proceeds until the payments are completed.

Therefore, the balance of equities tips in Plaintiff's favor.

**4. Public Interest**

Finally, the Court finds that the public interest factor is netural to both parties. "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009) (quoting *Bernhardt v. L.A. County*, 339 F.3d 920, 921 (9th Cir. 2003)). "If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Stormans*, 586 F.3d at 1139. Here, the injunction would not implicate the public's interest, as it is aimed at the Nagbys and the proceeds of the AmTrust sale.

Mrs. Nagby argues that if the Court were to grant Plaintiff an injunction it will effectively divest Judge Murphy, the state court judge presiding over the Nagbys' divorce proceedings, of his power to manage the community property funds. She argues that Judge Murphy has already appointed a financial receiver that is responsible for distributing the sale proceeds from PBIS to the Nagbys, rendering an injunction unnecessary. However, the financial receiver is merely responsible for ensuring that PBIS distributes the proceeds in accordance with

the stipulation the Nagbys entered into, not to ensure that fraudulently transferred assets are not further dissipated. The issue of fraudulent transfers was never before Judge Murphy. Therefore, the Court is not persuaded by Mrs. Nagby's argument.

Accordingly, the public interest is not a significant factor in this case and the *Winter* factors weigh in favor of granting Plaintiff's motion for a preliminary injunction.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

## VI. CONCLUSION

For the reasons discussed above, Plaintiff's motion for default judgment against PBIS (ECF No. 41) is **GRANTED** in the amount of $3,200,000.00 plus post-judgment interest at a legal rate from November 9, 2015 pursuant to 28 U.S.C. § 1961. A permanent injunction is also issued against PBIS and Cal-Regent prohibiting them from disposing of or commingling any funds or property representing the proceeds of the sale of PBIS to AmTrust including but not limited to all "earn out" distributions collected or to be collected from AmTrust, and further ordering PBIS to deposit those funds into the registry of this Court.

The Court also **GRANTS** Plaintiff's motion for preliminary injunction against the Nagbys (ECF No. 41). They will be enjoined from transferring, disposing of or commingling any funds or property representing the proceeds of the sale of the property of PBIS to AmTrust, including but not limited to any initial payments distributed by PBIS from the sale, as well as all "earn-out" distributions collected or to be collected from AmTrust, and it will be ordered that each of the Nagbys deposit those funds into the registry of this Court.

Because this Order addresses the same issues raised in Plaintiff's emergency motion for temporary restraining order, that motion is **DENIED** as moot (ECF No. 66).

Lastly, Plaintiff is ordered to file a request for post-judgment interest by October 10, 2017 to supplement the declaration submitted by Dean Kirby. *See* (Kirby's Decl. ¶ 5). Any objections should be filed by noon on October 13, 2017.

**IT IS SO ORDERED**.

Dated: October 4, 2017

_____
Barry Ted Moskowitz, Chief Judge
United States District Court

18
16-cv-03038-BTM-WVG