UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ODYSSEY REINSURANCE
COMPANY, a Connecticut
corporation,

Plaintiff,

v.

RICHARD KEITH NAGBY, et al,

Defendants.

Case No.:  16-cv-3038-BTM-WVG

**ORDER HOLDING DEFENDANT
DIANE DOSTALIK IN CONTEMPT
AND GRANTING PRELIMINARY
INJUNCTIONS**

**[ECF Nos. 199, 172, 194]**

Before the Court is an order to show cause ("OSC") why Defendant Diane
Dostalik, formerly known as Diane Nagby, ("Defendant") should not be held in
contempt of Court.  (ECF No. 199 ("December 2018 OSC re Contempt").)  The
OSC required that Ms. Dostalik show cause, if any, why the Court should not find
her in contempt for violating:

- the injunction order entered on October 4, 2017, (ECF No. 69 ("October 4,
  2017 Injunction Order"));

- the injunction order entered on May 4, 2018 (ECF No. 137 ("May 4, 2018
  Injunction Order")); and

1

- the temporary restraining order entered on August 8, 2018 (ECF No. 172 ("August 8, 2018 TRO")).

For the reasons discussed below, the Court holds Defendant Diane Dostalik in civil contempt.

Also pending before the Court are two temporary restraining orders ("TROs") issued by the Court on August 8, 2018 and November 7, 2018. (August 2018 TRO; ECF No. 194 ("November 7, 2018 TRO")).) Those orders required Defendant to show cause why preliminary injunctions should not issue having the same terms as the TROs. For the reasons discussed below, the Court grants the preliminary injunctions.

## FACTUAL BACKGROUND

This action arises out of the judgment entered by the United States District Court for the District of Connecticut in favor of Plaintiff Odyssey Reinsurance Company ("Plaintiff" or "Odyssey") and against Defendant Cal-Regent Insurance Services Corporation ("Cal-Regent") in the amount of $3,200,000.00 plus interest. (See ECF No. ("Second Am. Compl. or SAC") ¶¶ 15–17.) Cal-Regent was an insurance agency that underwrote certain insurance risks on behalf of State National Insurance Company ("State National"). (SAC ¶ 18.) Plaintiff in turn reinsured State National for a certain percentage of those risks, ranging from 90%–100%. (Id.) In accordance with a series of reinsurance agreements between the parties, Cal-Regent received a provisional commission—paid in part by Plaintiff—on all policies that it underwrote for State National. (SAC ¶ 19.) At the end of each year, the provisional commissions were adjusted depending on the profitability of the business underwritten by Cal-Regent. (SAC ¶ 20.) Where the provisional commission paid by Plaintiff exceeded the amount to which Cal-Regent was entitled to after the yearly adjustment, Cal-Regent was obligated to pay the difference to Plaintiff. (Id.) By 2013, Cal-Regent owed Plaintiff $2,740,802.61 in return commissions, in part due to a lawsuit against State

National that settled in February 2013.  (SAC ¶¶ 21–23, 25.)

Plaintiff alleges that by early 2013, Defendants Richard Nagby and Diane Dostalik "understood that the amount of return commissions owing to [Plaintiff] would substantially increase" as a result of the lawsuit.  (SAC ¶ 29.)  Plaintiff claims that "[a]s the potential effect of the [lawsuit] on Cal-Regent's obligation to pay return commission became clear to the Nagbys, they embarked on a plan to strip Cal-Regent of assets," (SAC ¶ 30), which began with the Nagbys forming Pacific Brokers Insurance Services ("PBIS"), a Nevada corporation, (SAC ¶35).

Plaintiff alleges that Mr. Nagby, with the help of Defendants CTS and David Dostalik, "caused funds otherwise owing to Cal-Regent and/or to its successor PBIS to be transferred to one or more account(s) held in the name of CTS" to conceal funds from creditors including Plaintiff.  (SAC ¶¶ 32, 40.7.)  Defendant David Dostalik allegedly released to the Nagbys for their benefit, "portions of the funds held by CTS on behalf of Cal-Regent."  (SAC ¶ 33.)  Some of the funds were also deposited into the Cal-Regent and PBIS operating accounts to pay creditors, "in order to deceive them as to the true status of Cal-Regent and CTS." (Id.)  "Other funds deposited into the Cal-Regent or PBIS operating accounts were characterized by the Nagbys as loans to those entities, so that payments back to the Nagbys could be characterized as tax-free loan repayments."  (Id.)

Plaintiff also claims that in April 2013, while Cal-Regent's debts remained outstanding, Mr. Nagby and Ms. Dostalik formed PBIS and subsequently "caused Cal-Regent to transfer substantially all of its assets to PBIS," including its goodwill and "book of business," without receiving reasonably equivalent value in exchange for these assets.  (SAC ¶¶ 35–36, 45.)  Mr. Nagby and Ms. Dostalik are both Cal-Regent's and PBIS's officers, directors, managers and shareholders.  (SAC ¶ 46.)  Plaintiff alleges that "PBIS was formed by [Mr. Nagby and Ms. Dostalik] for the specific purpose of continuing the business operations of Cal-Regent under a different name in order to hinder, delay or defraud the

creditors of Cal-Regent."  (SAC ¶ 49.)

In April 2014, Plaintiff filed an action in the District of Connecticut against Cal-Regent to recover the amount owed to Plaintiff in return commissions.  (SAC ¶ 12.)  In October 2015, the court rendered a judgment in Plaintiff's favor and against Cal-Regent in the amount of $2,740,802.61.  (SAC ¶ 14.)  In November 2015, the court awarded Plaintiff a supplement judgment.  (SAC ¶¶ 15–17.)  In addition to the October 2015 judgment the court also awarded Plaintiff $459,197.39, bringing the judgment to a total sum of $3,200,000.00 plus interest. (Id.)

Plaintiff alleges that "three months after oral argument on [Plaintiff's] motion for summary judgment in the Connecticut action and three months before the Judgment was entered, [Mr. Nagby and Ms. Dostalik] caused PBIS to sell substantially all of its assets to AmTrust North America, Inc. ("AmTrust") for $5 million."  (SAC ¶ 37.)  Of the sale proceeds ("the AmTrust proceeds"), AmTrust made an initial payment of $3 million to PBIS. (ECF No. 160-1, ¶¶ 3-4.)  The remainder was to be paid in the form of contingent "earn out" payments in three annual installments.  (ECF No. 165, Ex. 133, ¶ 3.)

As the only PBIS shareholders, Mr. Nagby and Ms. Dostalik decided how to allocate the AmTrust proceeds between the two of them during the course of their divorce proceedings.  *See In re: Marriage of: Diane M. Nagby v. Richard K. Nagby*, No. ED80574, in the Superior Court of California, County of San Diego. Per the "Stipulation and Order Re Division of PBIS Sale Proceeds and Outstanding Post-Judgment Issues" signed by the parties in May 2015, the two agreed that Ms. Dostalik would receive $2.5 million of the initial $3 million payment, while Mr. Nagby would receive the remaining $500,000.  *See id.*  They also agreed that Mr. Nagby would receive the earn out payments.  *Id.*

On August 4, 2015, Ms. Dostalik received $2.5 million, and Mr. Nagby received $500,000.  (ECF No. 140-3, Ex. 77; ECF No. 160-1, ¶ 14; ECF No. 165,

Ex. 133 ¶¶ 2, 5.)  In October 2016, AmTrust wired the first earn out payment in the amount of $894.583.19 to a PBIS bank account.  (ECF No. 140-3, Ex. 543.)  Mr. Nagby received those funds on October 21, 2016.  (ECF No. 140-3, Ex. 544.)

## PROCEDURAL BACKGROUND

Plaintiff filed the SAC on March 21, 2017, against several defendants including PBIS, Cal-Regent, and the Nagbys under several theories of liability including the Uniform Fraudulent Transfer Act ("UFTA"), California's alter ego and successor liability law, and principles of corporate law.  (SAC.)

On October 4, 2017, the Court granted Plaintiff's motion for the entry of a default judgment against Cal-Regent and PBIS in the amount of $3.2 million plus post-judgment interest.  (See ECF No. 68.)  The Court also granted Plaintiff a preliminary injunction against the Nagbys, restraining them from the dissipation of the AmTrust proceeds, including "all funds already received in connection with the sale of PBIS to AmTrust, and payments that are hereafter received from AmTrust."  (ECF No. 69 ("October 2017 Injunction Order".).)

On October 10, 2017, a stipulated order was entered directing AmTrust to pay into the Court registry the second and third earn out payments.  (See ECF No. 74 ("October 2017 Registry Order").)  Plaintiff and AmTrust filed a joint motion to dismiss AmTrust without prejudice.  (See ECF No. 84.)  The dismissal order required that AmTrust continue to abide by the October 2017 Registry Order.  (Id.)  AmTrust has now deposited the second and third earn out payments, totaling $958,017.66, into the Court registry.  (See ECF No. 223 ("Pl.'s Opp'n to Mot.-to-Interv."), 4:15-22.)

On October 27, 2017, the Court entered a judgment as to Cal-Regent and PBIS, including a monetary award against PBIS in the amount of $3,219,482.68, the amount owing on the District of Connecticut judgment against Cal-Regent.  (ECF No. 82.)  On March 5, 2018, the Court certified the judgment as final under Fed. R. Civ. P. 54(b).  (ECF No. 105.)  No appeal was taken.

On March 7, 2019, the Court denied a motion to intervene by third party Knight Insurance. (ECF No. 233.) On March 14, 2019, the Court granted a turnover motion in favor of Odyssey and directed payment of the AmTrust proceeds in the Court registry (the second and third earn out payments) to Odyssey. (ECF No. 234.) Knight Insurance has appealed both orders. (ECF Nos. 235, 236.) Mr. Nagby has appealed the order granting Plaintiff's turnover motion. (ECF No. 246.)

On April 22, 2019, the Court denied in part and granted in part a motion for summary judgment submitted by Defendants David Dostalik and CTS. (ECF No. 253.) Defendants David Dostalik and CTS have appealed the order. (ECF Nos. 263, 264.)

Pretrial dates have been set, culminating in the final pretrial conference scheduled for July 25, 2019. Trial is scheduled to begin August 19, 2019.

The Court has issued a series of injunctions and temporary restraining orders requiring Ms. Dostalik to deposit AmTrust proceeds in her possession into the Court registry, starting with the Court's October 4, 2017 Injunction Order. OSC proceedings as to why Ms. Dostalik should not be held in contempt with respect to those orders concluded on June 6, 2019. Below, the Court details the findings of fact and conclusions of law that serve as the basis for this Order holding Ms. Dostalik in civil contempt.

## DISCUSSION

### A. Contempt

A district court has the inherent power to enforce its orders through civil contempt. *See Shillitani v. United States*, 384 U.S. 364, 370 (1966). In the Ninth Circuit, a finding of civil contempt is proper when a party disobeys a specific and definite court order by failure to take all reasonable steps within the party's power to comply. *See Go-Video, Inc. v. Motion Picture Ass'n of America*, 10 F.3d 693, 695 (9th Cir. 1993).

16-cv-3038-BTM-WVG

The party moving the Court to adjudge another of contempt bears the initial burden of showing by clear and convincing evidence that the alleged contemnor has violated a specific and definite order of the Court. *See FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (citing *Stone v. City and Cty. of San Francisco,* 968 F.2d 850, 856 n.9 (9th Cir. 1992)). Upon such a showing, the burden shifts to the alleged contemnor to demonstrate why she was unable to comply. *Id.*

The inability to comply may constitute a defense to a charge of civil contempt. *Id.* (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)). In raising this defense, the defendant has the burden of production. *Rylander*, 460 U.S. at 757. The party asserting the defense "must show categorically and in detail why he is unable to comply." *Affordable Media,* 179 F.3d at 1241. "The contempt need not be willful." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal quotation marks and citation omitted). "Contempt sanctions, however, are not warranted where the nonmoving party's action 'appears to be based on a good faith and reasonable interpretation' of the court's order." *Newmark Realty Capital, Inc. v. BGC Partners, Inc.*, No. 16-cv-01702-BLF, 2018 WL 2416242, at *2 (N.D. Cal, May 29, 2018) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695).

At the contempt hearing, the propriety of the underlying order is not at issue; rather, the question for the Court is whether the alleged contemnor has the present ability to obey the Court's order. *See Maggio v. Zeitz*, 333 U.S. 56, 69 (1948). "[A] contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *Maggio*, 333 U.S. at 69; *Rylander*, 460 U.S. at 756-57.

The Court finds that Ms. Dostalik has violated two specific and definite

16-cv-3038-BTM-WVG

Court orders by failing to take all reasonable steps within her power to comply. *See Go-Video, Inc. v. Motion Picture Ass'n of America*, 10 F.3d 693, 695 (9th Cir. 1993). Plaintiff's presentation of evidence has revealed several violations of both the October 4, 2017 Injunction Order and the August 8, 2018 TRO.

### 1. Defendant Violated the October 4, 2017 Injunction Order

#### a. October 4, 2017 Injunction Order

On October 4, 2017, the Court ordered that Ms. Dostalik is:

> Preliminary enjoined and restrained from directly or indirectly: (a) Transferring, assigning, disposing of or commingling any funds or property received *in connection with the sale of PBIS to AmTrust*, including but not limited to all "earn out" distributions collected or to be collected from AmTrust.

(October 4, 2017 Injunction Order, 2:15-23) (emphasis added).

The Court also ordered Ms. Dostalik to:

> deposit in the registry of the Court by October 11, 2017 all funds already received *in connection with the sale of PBIS to AmTrust*, and payments that are hereafter received from AmTrust or its agent within 24 hours of receipt.

(Id. at 2:24-27) (emphasis added).

Finally, the Court warned that any act "in violation of the terms of [the] Order may be considered and prosecuted as contempt of this Court." (Id. at 3:6-7.)

#### b. Defendant Failed to Deposit At Least $176,263.13 in AmTrust Proceeds into the Court Registry

The Court finds that on October 4, 2017, Ms. Dostalik had in her possession at least $176,263.13 in AmTrust Proceeds and failed to deposit these funds into the Court registry, in violation of the October 4, 2017 Injunction.

Ms. Dostalik initially received the $2.5 million payment in connection with the sale of PBIS to AmTrust on August 4, 2015 through an incoming wire

16-cv-3038-BTM-WVG

transfer.[1]  (See Pl. Ex. 91A.)  The testimony of Plaintiff's expert witness, Mr. Brian Bergmark, demonstrates what happened to the AmTrust proceeds from its initial deposit on August 4, 2015 to October 4, 2017, when the Court entered its Order.  (See generally ECF No. 229 ("Tr. of OSC Hr'g on May 20, 2019" or "Tr. May 20, 2019"), 3-54.)  Mr. Bergmark testified that in conducting his analysis of the $2.5 million, he relied on a method called proportional or allocation tracing.[2]  (Id. at 17:9-12.)  Mr. Bergmark explained that as the $2.5 million was transferred throughout Ms. Dostalik's various bank accounts or used to pay for expenses, he kept track of "two separate buckets of monies," one that consisted of AmTrust money and the other that consisted of personal funds.  (Id. at 16:20-17:8.)  With this tracing, Mr. Bergmark at all times tracked the proportion or percentage of each account balance consisting of AmTrust proceeds.  (Id at 18-2019:13.)  When money was transferred between accounts, Mr. Bergmark preserved the "character" of the funds, whether AmTrust or personal, to ensure that the percentage of AmTrust funds in each account remained accurate.  (Id. at 20:16-22:2.)  When money was used to pay for expenses, Mr. Bergmark attempted to characterize the type of expense as an AmTrust withdrawal or personal in nature.  (Id. at 17:14-18:18.)  He then subtracted the expense from the AmTrust funds or personal funds in the account accordingly.  (Id.)  Mr. Bergmark emphasized that for this part of the analysis, he was always "conservative," and would subtract expenses from the AmTrust money unless he could clearly identify that it was personal in nature.  (Id.)

---

[1] Defendant has disputed Plaintiff's assertion that this $2.5 million wire transfer did in fact represent the proceeds that Ms. Dostalik received in connection with the sale of PBIS to AmTrust.  However, Defendant has presented no evidence whatsoever that on August 4, 2015, Ms. Dostalik was in the receipt of $2.5 million from any other transactions not related to the sale of PBIS.

[2] Mr. Bergmark's complete testimony explaining proportional tracing can be found in the Tr. of OSC Hr'g on May 20, 2019, 15:13-22:20.

16-cv-3038-BTM-WVG

Mr. Bergmark analyzed nine of Ms. Dostalik's bank accounts to trace the initial $2.5 million deposit:

- Bank of the West Personal Checking (0019)
- Bank of the West Personal Money Market (0001)
- Wells Fargo Personal Checking (9396)
- Wells Fargo Personal Savings (9984)
- Wells Fargo Green Tree Funding LLC Checking (1268)
- Wells Fargo Green Tree Funding LLC "Additional" Checking (9404)
- Wells Fargo Green Tree Funding LLC Savings (9976)
- Chase Nevada Cactus Growers LLC Checking (6375)
- Chase Nevada Cactus Growers LLC Savings (7150)

(Id. at 14:5-15:11.) The $2.5 million was originally deposited into Bank of the West Personal Checking (0019) on August 4, 2015. (Pl. Ex. 91A; Tr. May 20, 2019, 15:20-16:4.) For the next two years, the money was disbursed throughout Ms. Dostalik's nine accounts. (Pl. Exs. 91, 93, 149.) From the date of the initial deposit to October 4, 2017, Mr. Bergmark testified that the total aggregate balance of the nine accounts was never less than 97% AmTrust proceeds. (Tr. May 20, 2019, 42:24-43:12.)

As of October 4, 2017, three[3] of Ms. Dostalik's accounts had balances consisting of both personal funds and AmTrust proceeds:

- Chase Nevada Cactus Growers LLC Savings (7150): The total account balance was $97,086.29, (Pl. Ex. 93C), $96,799.24 of which was AmTrust proceeds, (Tr. May 20, 2019, 33:1-10). The balance was 99.7% AmTrust proceeds. (Id. at 33:1-10.)
- Chase Nevada Cactus Growers LLC Checking (6375): The total

---

[3] Mr. Bergmark testified that on October 4, 2017, four accounts had balances consisting of AmTrust proceeds. (See Tr. of OSC Hr'g on May 20, 2019, 36:19-37:14.) Defendant did not object, nor did Defendant provide any evidence to the contrary. However, the record does not support the finding that the Wells Fargo Personal Checking (9396) had any funds remaining by October 4, 2017. (See Pl. Ex. 149.) The bank statements for this account included in Plaintiff's Exhibit 149 conclude with the statement from September 1-30, 2017, which reflects an ending balance of $0 on September 22, 2017. Thus, the Court finds that on October 4, 2017, only three of Ms. Dostalik's account balances included AmTrust funds.

16-cv-3038-BTM-WVG

account balance was $71,787.18, (Pl. Ex. 93D), $71,068.06 of which was AmTrust proceeds, (Tr. May 20, 36:2-13). The balance was 99.7% AmTrust proceeds. (Id. at 36:2-13.)

- Wells Fargo Green Tree Funding LLC Checking (1268): The total balance was $8,587.34, (Pl. Ex. 149), $8,395.83 of which was AmTrust proceeds, (Tr. May 20, 2019, 36:19-37:14). The AmTrust proceeds consisted of 97.7% of the funds in that account. (Id. at 36:19-37:14.)

Thus, the Court finds by clear and convincing evidence that on October 4, 2017, Ms. Dostalik had $176,263.13 of AmTrust money in three of her bank accounts that was accessible to be deposited into the Court registry. Because Ms. Dostalik failed to deposit these funds into the Court registry by the deadline on October 11, 2017, she is in contempt of the October 4, 2017 Injunction Order.

### c. Defendant Comingled and Transferred AmTrust Proceeds

The Court finds that Ms. Dostalik first comingled AmTrust proceeds by depositing the proceeds of the sale of real estate into an account with a balance consisting of 99.7% AmTrust money and then transferring those comingled funds to a new account with an offshore bank, in violation of the October 4, 2017 Injunction Order.

Ms. Dostalik sold real estate she owned in Twin Peaks, California ("the Twin Peaks property") in the fall of 2017. (Pl. Ex. 93C; Tr. May 20, 2019, 37:18-38:8.) On October 20, 2017 she received $297,306.04 in proceeds from the sale, which was deposited into Chase Nevada Cactus Growers LLC Savings (7150). (Id.) At the time, this account consisted of 99.7% AmTrust funds. (Tr. May 20, 2019, 33:1-10.) Between October 4 and 20, 2017, no other deposits or withdrawals were made. (Pl. Ex. 93C.) Thus, by depositing the Twin Peaks proceeds into Chase Nevada Cactus Growers LLC Savings (7150), Ms. Dostalik comingled the property sale funds with AmTrust proceeds, in an account that had been 99.7% AmTrust proceeds, in violation of the Court's Order.

After the deposit of the Twin Peaks funds, Chase Nevada Cactus Growers

16-cv-3038-BTM-WVG

LLC Savings (7150) had a balance of $394,392.93. (Pl. Ex. 93C.) At this point, the account consisted of 24.54% AmTrust proceeds. (Tr. May 30, 2019 38:25-39:6.) On October 26, 2017, $37,000 was transferred from Chase Nevada Cactus Growers LLC Checking (6375) to the Savings (7150), bringing the balance of the Savings (7150) to $431,377.93. (Pl. Ex. 93C; Tr. May 30, 39:7-17.) That same day, Ms. Dostalik then transferred $431,077.93 from the Savings (7150) to the Checking (6375). (Pl. Exs. 93C, 93D.) The next day on October 27, 2017, Ms. Dostalik transferred via wire $431,377.93 from the Checking (6375) to an account at Caye International Bank ("Caye 2015 Diane M. Dostalik Trust (3164)"), again violating the Court's Order. (See Pl. Exs. 93D, 140C, 140N.)

Thus, Ms. Dostalik is in contempt of the Court's Order for multiple instances of comingling and transferring AmTrust funds between October 20 and 27, 2017.

### d. Defendant Failed to Deposit At Least $551,750 in AmTrust Proceeds into the Court Registry

The Court finds that by the end of July 2018, Ms. Dostalik had in her possession at least $551,750 in AmTrust Proceeds and failed to deposit these funds into the Court registry, in violation of the October 4, 2017 Injunction.

On June 13, 2016, Ms. Dostalik invested $500,000 into Rich Uncles Real Estate Investment Trust ("REIT") with funds from Wells Fargo Personal Checking (9396). (See Pl. Exs. 15, 149; ECF No. 209 ("Tr. of OSC Hr'g on Dec. 20, 2018" or "Tr. Dec. 20, 2018"), 108:19-109:22.) During the OSC proceedings on December 20, 2018, Ms. Dostalik testified that the funds for this investment came from the $2.5 million she received in connection with the sale of PBIS to AmTrust:

Question [by Plaintiff's counsel]: You previously had an investment at Rich Uncles REIT, correct?
Answer [by Defendant]: Correct.

Q: What was that?

A: I'm sorry. Correct. Yes.

Q: And you had invested $500,000 in Rich Uncles REIT from the $2.5 million that you received, correct?

A: From the martial settlement, yes.

(Tr. Dec. 20, 2018, 108:19-109:1.) Plaintiff's counsel then asked Defendant to examine a record of the investment in one of Defendant's bank statements and again confirmed with Defendant that this money came from the $2.5 million in AmTrust funds:

Question [by Plaintiff's counsel]: And I'd like for you to turn to the fifth page, [of Plaintiff's Exhibit 15, a statement from June 1-30, 2016 for Wells Fargo Personal Checking (9396)] please. And about a third of the way down on, June 13th, 2016, there's a $500,000 withdrawal to Fund'em Rich Uncles Next Region. Is that when you invested $500,000 in Rich Uncles?

Answer [by Defendant]: Yes. In 2016, yes.

Q: And that came from the $2.5 million that you received, correct?

A: It came from my marital settlement, yes.

(Id. 109:15-22.)[4]

From April to July 2018, Ms. Dostalik received checks from Rich Uncles REIT made out to the Diane M. Dostalik Trust in the following amounts:

- $9375 on April 25, 2018 (check no. 5890)
- $266,500 on July 16, 2018 (check no. 519)
- $266,500 on July 16, 2018 (check no. 520)

---

[4] Ms. Dostalik emphasized that she received the $2.5 million during her divorce proceedings, which Plaintiff does not dispute. Notwithstanding this emphasis, it remains clear that the $2.5 million being discussed is Ms. Dostalik's share from the sale of PBIS to AmTrust. (See Pl. Exs. 42, 44.) Indeed, Defendant offered no proof that she received another sum of $2.5 million as part of her divorce proceedings unrelated to the sale of PBIS.

16-cv-3038-BTM-WVG

- $9,375 on July 25, 2018 (check no. 6405)

(Pl. Ex. 5.)  The four checks together total $551,750, which Ms. Dostalik did not deposit into the Court registry.

Thus, the Court finds Ms. Dostalik in contempt for failing to deposit $551,750 in AmTrust proceeds into the Court registry, in violation of the October 4, 2017 Injunction Order.

## 2. Defendant Continued to Violate the October 4, 2017 Injunction Order and Violated the August 8, 2018 TRO

### a. August 8, 2018 TRO

On August 8, 2018, the Court ordered that Ms. Dostalik is:

[P]rohibited and enjoined from disbursing or transferring funds, or aiding, suffering or effecting the disbursement of funds, from any account established at *Caye International Bank*, without further order of this Court.

(August 8, 2018 TRO, ¶ 1) (emphasis added).

//

The Court also ordered that Ms. Dostalik is "enjoined from selling, assigning, transferring, liquidating or withdrawing any funds, shares, equity interests or proceeds in relation to any investment" "relating to" "Rich Uncles, LLC" or "bitcoin."[5]  (Id. at ¶¶ 2-3.)

---

[5] Throughout Ms. Dostalik's testimony, when referencing her alleged cryptocurrency investments, she at times said "bitcoin," while at other times, she said "cryptocurrency."  Her attorney clarified for the record that Ms. Dostalik had been using the terms interchangeably. Counsel asked her during the OSC proceeding, "Just to clarify some of your testimony, when you say that money went to bitcoin, were you generalizing the statement when you said, 'bitcoin,' or were you specifically meaning bitcoin when you sent the money?"  (See ECF No. 277 ("Tr. of OSC Hr'g on May 21, 2019" or "Tr. May 21, 2019"), 63:8-11.)  In response, Ms. Dostalik answered, "Generalization." (Id. at 63:14.)  Thus, the Court understands that when Ms. Dostalik has testified as to her "bitcoin" investments, she was referring to cryptocurrency investments generally.  Because the Court's August 8, 2018 TRO was issued in part based off of Ms. Dostalik's deposition testimony with respect to "bitcoin" investments, the Court clarifies that any reference to "bitcoin" investments in the August 8, 2018 TRO encompasses

Finally, the Court ordered that Ms. Dostalik must provide discovery, with respect to accounts and investments relating to Caye International Bank, Rich Uncles REIT, and bitcoin.  (Id. at ¶¶ 4.1.1, 4.1.2, 4.1.3, 4.2.)

Again, the Court warned that "[a]ny violation of this Order may be treated as a civil or criminal contempt and may subject the violator to arrest and prosecution for such contempt."  (Id. at ¶ 6.)

### b. Defendant Transferred and Disbursed Caye Bank Funds and Rich Uncles Proceeds

Ms. Dostalik transferred and disbursed funds that had been withdrawn from her Caye Bank account and proceeds from her Rich Uncles investment on August 13, 2018 and September 4, 2018, in violation of the August 8, 2018 TRO.

From about April to August 2018, Ms. Dostalik was withdrawing funds from Caye 2015 Diane M. Dostalik Trust (3164).  (See generally Pl. Ex. 140N.)  Some of these withdrawals occurred in the form of wire transfers.  (Pl. Exs. 140I, 140K, 140F.)  Ms. Dostalik also withdrew money by requesting that the bank load her Caye Bank debit card, which occurred monthly from March to August 2018.  (Pl. Exs. 140E, 140G, 140H, 140J, 140L, 140M.)  In total, these wire transfers and debit card reloads amount to about $338,039.  (Pl. Exs. 140I, 140K, 140F, 140E, 140G, 140H, 140J, 140L, 140M.)  No documents were produced by either party to show how Ms. Dostalik used the funds on the Caye Bank debit card, but Defendant testified that all the money on the debit card was used to invest in cryptocurrency, with a few minor exceptions for personal expenses like paying "a phone bill" or using "some for gas."  (Tr. May 20, 2019, 59:6-60:16.)

In June and July 2018, two of three wire transfers, in the amount of $260,000 were transferred to Ms. Dostalik's checking account at Citibank

_____

cryptocurrency investments generally.

16-cv-3038-BTM-WVG

("Citibank Diane M. Dostalik Checking (8897)").  (Pl. Exs. 152A, 152C.)  As discussed above in Part A(1)(d), Ms. Dostalik received three checks from Rich Uncles in July 2018.  (Pl. Ex. 5 (check nos. 519, 520, 6405).)  In total these checks amount to $542,375.  (Id.)  Ms. Dostalik deposited one check into Citibank Diane M. Dostalik Checking (8897) and the other two into her Citibank savings account ("Citibank Diane M. Dostalik Savings (8921)").  (Pl. Ex. 152C.)  Thus, throughout June and July 2018, approximately $802,375 of money from Caye Bank and Rich Uncles proceeds was deposited into Ms. Dostalik's accounts at Citibank.  (Pl. Exs. 152A, 152C.)  During this time, no other major deposits were made.  (Id.)

As Ms. Dostalik was transferring money into her Citibank accounts, she was also transferring money out to Gemini Trust Co, LLC ("Gemini").  (Id.)  Between June and July 2018, Ms. Dostalik wired about $509,000 from Citibank to Gemini.  (Id.)  Ms. Dostalik testified that all money wired to Gemini was for the purpose of investing in cryptocurrency.  (See Tr. May 20, 2019, 68; Tr. May 21, 2019, 31, 35-37.)  All or substantially all this money came from Caye Bank or Rich Uncles.  (Pl. Exs. 5, 140I, 140K, 140F, 140E, 140G, 140H, 140J, 140L, 140M, 152A, 152C.)

This sequence of transfers and deposits of funds consisting in large part of AmTrust proceeds was done in violation of the Court's October 4, 2017 Injunction Order.

In August and September 2018, Ms. Dostalik made two additional wire transfers from Citibank to Gemini.  (Pl. Ex. 152D.)  The first was initiated on August 13, 2018, in the amount of $50,000.  (Id.)  The second was on September 4, 2018, in the amount of $10,000.  (Id.)  Additionally, Ms. Dostalik requested a debit card reload from Caye Bank on August 7, 2018 for $9052.  (Pl. Ex. 140M.)  The balance of the Caye 2015 Diane M. Dostalik Trust (3164) reflects a $9052 reduction on August 8, 2018, demonstrating that on August 8, 2018, the day of

16-cv-3038-BTM-WVG

the Court's order, Ms. Dostalik had $9052 in Caye Bank funds on her debit card.

These last two wire transfers, as transfers of money in large part made up of AmTrust proceeds and comprised of disbursements of Caye Bank funds and Rich Uncles proceeds, were in violation of both the October 4, 2017 Injunction Order and the August 8, 2018 TRO. Ms. Dostalik testified that she used the $9052 on her debit card on August 8, 2018 to invest in cryptocurrency, (Tr. May 20, 2019, 59:6-60:16), which, as a disbursement of Caye Bank funds, also violated the August 8, 2018 TRO.

### c. Defendant Failed to Provide Documents and Information Related to Caye Bank, Rich Uncles, and Cryptocurrency Accounts and Investments

Ms. Dostalik failed to produce documents and information with respect to Caye Bank, Rich Uncles, and cryptocurrency, in violation of the August 8, 2018 TRO.

As to Caye Bank, Ms. Dostalik was provided access to an online account when she opened the account in 2017. (Pl. Exs. 140A, 140B.) Defendant testified that she recorded her password for her account when filling out a debit reload request on August 7, the day before the Court's Order. (Pl. Ex. 140M; Tr. May 21, 2019 13:4-19.) However, she never disclosed that information to Plaintiff, in violation of the Court's Order. If Ms. Dostalik did manage to lose her password in the roughly 24-hour period between the debit reload request and the Court's Order, she failed to take reasonable steps to recover it. Ms. Dostalik also failed to take reasonable steps to request bank statements, if she in fact did not already have access to them. (Tr. May 21, 2019 13:20-23.) Ms. Dostalik also failed to produce email exchanges between herself and Caye Bank. (Pl. Exs. 140E, 140O.)

As to Rich Uncles, Ms. Dostalik failed to produce any information about the four checks she received from April to July 2018, even though three of those four

16-cv-3038-BTM-WVG

checks had just been received less than a month before the Court's Order.  (Pl. Ex. 5.)  Moreover, Ms. Dostalik failed to take reasonable steps to correct her deposition testimony in May 2018 that her Rich Uncles investment had been completely liquidated.  (Pl. Ex. 155 ("Dep. Diane Dostalik, Vol. II"), 190:4-10; see also Tr. May 21, 2019, 32:9-34:10.)  At the December 20 OSC hearing, Ms. Dostalik testified that the two Rich Uncles checks for $266,500 each were deposited into her Caye Bank account, after first being deposited into an intermediary bank, all descriptive details of which, including name and location, she was unable to recall.  (Tr. Dec. 20, 2018, 126:8-12.)

As to any cryptocurrency investments, Ms. Dostalik has failed to produce anything whatsoever with respect to over $680,000 that she testified had been invested into cryptocurrency from June to September 2018.  (Tr. May 21, 2019, 37:25-38:5.)

In fact, the only information provided by Ms. Dostalik as to the discovery order in the August 8, 2018 TRO is a letter on September 21, 2018 from Ms. Dostalik's counsel to Plaintiff's counsel.  (See Pl. Ex. 21.)

As to Caye Bank, the letter asserts:

> Ms. [Dostalik] contends she testified the account was closed and there is no money in the account.  Ms. [Dostalik] also contends she did not maintain the login information for the website, and she does not have the login information.  She did not receive any documents from them other than the documents which were the subject of her deposition . . . .

(Id. at 1.)  However, the record reflects that as of the date of this letter, Ms. Dostalik's Caye bank account was still open and contained about $40,000.  (Pl. Ex. 140N.)

As to Rich Uncles:

> Ms. [Dostalik] contends the request to liquidate the account was made months before Ms. [Dostalik]'s deposition was taken.  Ms. [Dostalik] does not have the login information anymore, she does not

recall the login information, and she did not receive any documents that might be produced.

(Id. at 2.)  However, the record reflects that just two months prior, Ms. Dostalik had received over $533,000 from Rich Uncles.  (Pl. Ex. 5.)  Ms. Dostalik produced no documents or information to disclose this fact to Plaintiff.

As to any cryptocurrency investment:

Ms. [Dostalik] contends she no longer has any cryptocurrency account, including Bitcoin.  The "coins" were managed by a company called Shapeshift, and transferred into a cryptocurrency called Monero.  The first week of August, there was a Mega Chrome Extension Hack (information available online and on news outlets), and Ms. [Dostalik]'s username and password were taken.  She has no access to the account, and she does not know the status of any cryptocurrency funds.

(Id. at 3.)  However, Ms. Dostalik produced no information or documents that she ever had an account at ShapeShift.  If Ms. Dostalik's ShapeShift account was in fact hacked, there is no evidence, other than Ms. Dostalik's testimony. Ms. Dostalik also failed to produce any evidence that she took steps to recover her $680,000 investment, such as filing a police report or at the very minimum, contacting Shapeshift.  Moreover, if Ms. Dostalik did lose account information as a result of a hack that she reported occurred in August 2018, then she must have managed to create a new or separate account for the purpose of the cryptocurrency investment that she testified occurred in September.  She failed to disclose any information about a new or separate account.

Thus, in failing to produce any documents with respect to Caye Bank, Rich Uncles, and cryptocurrency investments, Ms. Dostalik violated the Court's August 8, 2018 TRO.

### 3. Defendant Has Willfully Violated the Court's Orders

While Plaintiff need not show willfulness, *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695, the Court nonetheless finds that Ms.

Dostalik acted willfully in violating the October 4, 2017 Injunction and the August 8, 2018 TRO.  Substantial evidence demonstrates that Ms. Dostalik acted deceitfully and with little regard or respect for Court orders.

First, the Court finds that Ms. Dostalik understood that the $2.5 million sum she received during the course of her divorce proceedings was related to the sale of PBIS to AmTrust and was required to be deposited into the Court registry. Any testimony that she did not understand her obligations under the October 4, 2017 Injunction is inconsistent with her prior statements.

On October 5, 2017, Ms. Dostalik sent two emails reflecting that she understood the October 4, 2017 Injunction.  The morning of October 5, Ms. Dostalik wrote, in an email to Suzanne Werden, that the Court's Order was "on PBIS, Cal Regent, MR. Nagby and myself.  The court ordered I cannot transfer any assets.  I'm supposed to register my assets with the court."  (Pl. Ex. 1) (quoted as appears).  Later that day, Ms. Dostalik sent another email to Suzanne Werden, stating, "[i]n a nutshell, Judge Prepared Order Granting [Plaintiff]'s Motion for Default Judgment and Motion for Preliminary Injunction for us to turn over all our assets to the court."  (Id.) (quoted as appears).  At this point, as Mr. Bergmark testified, the money accessible to Ms. Dostalik was 97% AmTrust proceeds, making up substantially all of her assets.  (Tr. May 20, 2019, 42:24-43:12.)  This explains why Ms. Dostalik stated that she was required to turn over "all" assets.

In another email just a few weeks later on October 23, 2017, Ms. Dostalik again demonstrated her understanding of the Injunction.  Ms. Dostalik wrote, in another email to Suzanne Werden:

> I had a brain storm at 3:00 in morning last night, to see if [counsel]
> would do a motion for me with Judge Murphy to Correct or Modify the
> Divorce Judgement to say "Marital Settlement" from Property
> Settlement, as there is no spousal support for a 22-year marriage,
> and so there should be an update on the status of the divorce

judgment.

> [Mr. Nagby] can't have his cake and eat it, too. If he is not going to pay one cent of spousal support, then it should be corrected that *the money from AmTrust* is a martial settlement. Am I correct, that that would get me out of the AmTrust case?

(Pl. Ex. 155) (emphasis added).

Finally, there is some evidence to suggest that shortly after Ms. Dostalik received the $2.5 million in AmTrust proceeds in 2015, she understood that the funds could be subject to a money judgment. (Pl. Ex. 48.) In an email sent on October 30, 2015 to Barbara Hopper which included bank account information for the Nevada Cactus Growers LLC and Green Tree Funding LLC accounts, Ms. Dostalik explained:

> Because of two lawsuits against Cal-Regent, it was recommended to me that I open up these Nevada corporate accounts so that if the corporate veil was pierced and we were personally responsible, the money would be in these (2) Nevada corporations.

(Pl. Ex. 48.) At a minimum, this evidence demonstrates that Ms. Dostalik had a long-held understanding that the $2.5 million she received in 2015 was in connection with business transactions relating to Cal-Regent, PBIS, and AmTrust and that the money was subject to the Court's October 4, 2017 Injunction.

Second, Ms. Dostalik's repeated assertions that every action she took with respect to her personal finances was a result of advice from financial advisors are not corroborated by the evidence as a whole. In particular, Ms. Dostalik often explained her actions as a result of advice given from Ms. Suzanne Werden. Ms. Werden testified that she first met Ms. Dostalik in 2015 when Ms. Dostalik came to her seeking advice on her tax liability on the proceeds she received "when [PBIS] was sold," which "would have been her share of the business." (Tr. Jan. 29, 2019, 7:3-20.) But, in contrast with Ms. Dostalik's testimony, (see Tr. Dec. 20, 2018, 92:25-96:4), Ms. Werden testified that she did not manage any

16-cv-3038-BTM-WVG

of Ms. Dostalik's bank accounts or personal finances, nor did she ever check the balances of Ms. Dostalik's bank accounts. (See generally id. at 8-11; see also id. at 10:22-11:5.) Ms. Werden did not manage Ms. Dostalik's accounts or investments relating to Caye Bank, (Id. at 8:5-24.), Rich Uncles (Id. at 9:6-10:21), or cryptocurrency (Id. at 8:25-9:5). While Ms. Werden suggested that Ms. Dostalik should sell real estate in El Cajon, California, she was not personally involved in the steps Ms. Dostalik then took to try to sell it. (Id. at 11:6-18.) Finally, Ms. Werden testified that she has not been in contact with Ms. Dostalik since May 2018 (Id. at 11:19-22), in spite of Ms. Dostalik's testimony that Ms. Werden was still providing advice after this point. (See, e.g., Tr. May 21, 2019, 16:22-17:11 (reflecting Ms. Dostalik's testimony that in December 2018, Ms. Werden was still providing Ms. Dostalik advice on how to manage her financial accounts).) As discussed below in Part A(4), because the Court does not find Ms. Dostalik's self-serving testimony to be credible, the Court gives weight to Ms. Werden's testimony over Ms. Dostalik's, with respect to the nature and extent of their relationship.

Third, Ms. Dostalik took active steps to thwart Court orders. In spite of the August 8, 2018 TRO freezing her assets at Caye Bank, Ms. Dostalik sent two emails to Caye Bank in early December 2018 demanding that the remaining funds in her account be released. (Pl. Ex. 140P.) For example, on December 6, 2018, Ms. Dostalik wrote:

> Another request for the release of the funds in the 2015 Diane Dostalik Trust. You are illegally holding funds that have been requested to be released numerous times. Close the bank account and forward the check to the mailing address you have on file for the Trust. My attorney has indicated there is no court order against the Trust and you are in error. If I lose my house because you are refusing to close the account for the 2015 Trust I will have no choice but to seek legal recourse.

(Id.)

16-cv-3038-BTM-WVG

In addition, after the Court ordered Ms. Dostalik to sign a consent directive instructing Caye International Bank to comply with discovery requests, (see ECF No. 208, Ex. A), she sent Caye Bank an altered copy with the majority of the directive crossed out.  (Pl. Ex. 140Q.)  Even though the Court denied Ms. Dostalik's motion to include "under protest" with her signature, (see ECF No. 219 ("Tr. of OSC Hr'g on Jan. 3, 2019" or "Tr. Jan. 3, 2019"), 23-26), Ms. Dostalik hand wrote this language on the altered copy.  (Pl. Ex. 140Q.)  She also wrote: "Forced to sign under duress, under protest and without A jury trial, as Requested.  Do Not Follow this. Court Order. I was forced to sign this against my will without a jury trial.  You do not have my authorization to Release any Records or any Funds."  (Id.) (quoted as appears).

Thus, testimony that Ms. Dostalik did not understand that the $2.5 million she received in 2015 was subject to the October 4, 2017 Injunction Order is not credible.  Any testimony that Ms. Dostalik acted in good faith or was ignorant she was violating the Court's orders is not credible.  Consequently, the Court finds that Ms. Dostalik's violations of Court orders were willful.

### 4. Defendant's Self-Serving Testimony Is Not Credible

Ms. Dostalik has demonstrated that she is an unreliable witness, and thus, the Court gives very little weight to her self-serving testimony.  As demonstrated by the Court's discussion above, there are numerous inconsistencies throughout Ms. Dostalik's testimony.  For example, in Ms. Dostalik's deposition in May 2018, she stated that her Rich Uncles investment had been completely liquidated. (Dep. Diane Dostalik, Vol. II, 190:4-10; see also Tr. May 21, 2019, 32:9-34:10.) However, the record reflects that in July 2018, Ms. Dostalik received over $533,000 in funds from the Rich Uncles investment.  (Pl. Ex. 5.)  If Ms. Dostalik had been confused or mistaken during her deposition, she made no effort to correct her deposition testimony.

There are also significant gaps in Ms. Dostalik's testimony.  Ms. Dostalik

16-cv-3038-BTM-WVG

often testified that she could not recall when asked questions about big sums of money and actions taken recently. It is not credible, for example, that Ms. Dostalik could not remember any details whatsoever about the bank where she testified that she deposited the checks she received from Rich Uncles in July 2018 amounting to over $533,000. (Tr. Dec. 20, 2018, 126:8-12.) Either Ms. Dostalik truly could not remember what she did with over half a million dollars less than six months prior, which makes her a very unreliable witness, or, Ms. Dostalik was lying when she testified that she could not recall any details.

In addition, due to Ms. Dostalik's actions in violation of Court orders, the Court finds that Ms. Dostalik has little respect for the Court's authority. For example, after the Court enjoined Ms. Dostalik from transferring funds at Caye Bank, Ms. Dostalik attempted to coerce Caye Bank into permitting her to withdraw funds. (Pl. Ex. 140P.)

Finally, Ms. Dostalik's testimony throughout the OSC proceeding that she had no access to bank statements or documents with respect to her account at Caye Bank or her investments in Rich Uncles and cryptocurrency is not credible. The record reflects that between June and September 2018, Ms. Dostalik withdrew funds from Caye Bank and deposited checks from Rich Uncles in order to transfer about $680,000 into her account with Gemini. (Pl. Exs. 5, 140I, 140K, 140F, 140E, 140G, 140H, 140J, 140L, 140M, 152A, 152C, 152D; Tr. May 21, 2019, 37:25-38:5.) It is not credible that Ms. Dostalik was unable to access any of this documentation.

These examples, and others already discussed, demonstrate that Ms. Dostalik is not a credible witness and that the Court cannot rely on her self-serving testimony. Thus, the Court gives very little weight to evidence offered in the form of self-serving testimony by Ms. Dostalik.

### 5. Defendant Failed to Demonstrate Inability to Comply

Defendant has failed to meet her burden to demonstrate that she is

16-cv-3038-BTM-WVG

currently unable to comply with the Court's October 4, 2017 Injunction and August 8, 2018 TRO. During Defendant's presentation of the evidence, she testified with respect to her bank accounts at Chase, Bank of the West, Wells Fargo, and Citibank. (Def. Exs. 2, 3, 4, 5, 10; see also Tr. May 21, 2019, 468-479.) The balances of these accounts read $0, with the exception of the Citibank account, which has a balance of about $120. (Id.) However, this evidence is not sufficient to carry Defendant's burden to demonstrate inability to comply. Defendant "must show categorically and in detail why [s]he is unable to comply." *Affordable Media,* 179 F.3d at 1241.

The evidence reflects that between June and September 2018, Ms. Dostalik deposited over $680,000 into Gemini Trust LLC. (Tr. May 21, 2019, 37:25-38:5.) However, Defendant has presented no credible evidence that she no longer has access to these funds. Ms. Dostalik has merely stated that her cryptocurrency investments were hacked, but as discussed above, this self-serving testimony is not credible.

Ms. Dostalik has repeatedly represented to the Court that she is not able to comply with Court orders. On September 21, 2017, in opposition to her former attorney's motion to withdraw, Ms. Dostalik wrote in a letter to the Court that she had "no money left to hire a new attorney" and that she had "nothing left, after living on the [AmTrust proceeds] for three years, paying lawyers for nothing, and paying taxes." (ECF No. 59.) However, as discussed above in Part A(1)(b), the record reflects that Ms. Dostalik had at least $175,000 in her bank accounts at that time. She also had $500,000 invested in Rich Uncles that she testified she "pretended" she was unable to access in September 2017. (See Tr. May 21, 2019, 43:9-18, 44:1-5, 64:2-13.) Between July and September 2018, she also donated $45,000 to charities, gave $10,000 to her niece, and invested $12,932.50 in gold and silver. (See Pl. Ex. 152E; see also Tr. May 21, 2019, 38:17-42:7.) Thus, the Court does not find Ms. Dostalik credible when she has

testified that she is unable to comply with Court orders. (See, e.g., Tr. May, 21, 2019, 38:6-16.)

Thus, Defendant has failed to show categorically and in detail inability to comply.

### 6. Remedies

The Court holds by clear and convincing evidence that Ms. Dostalik is in contempt for violating the October 4, 2017 Injunction and the August 8, 2018 TRO. Ms. Dostalik violated the October 4, 2017 Injunction by:

- failing to deposit $176,263.13 in the Court registry on October 11, 2017;
- comingling and transfering AmTrust proceeds between October 2017 and September 2018; and
- failing to deposit $551,750 in the Court registry on July 25, 2018.

Ms. Dostalik violated the August 8, 2018 TRO by:

- transferring and disbursing Caye Bank funds and Rich Uncles proceeds on August 13, 2018 and September 4, 2018; and
- failing from August 8, 2018 onward to provide documents and information related to Caye Bank, Rich Uncles, and cryptocurrency accounts and investments.

A district court's contempt award is civil "if it coerces compliance with a court order or is a remedial sanction meant to compensate the complainant for actual losses." *Ahearn ex rel. NLRB v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013) (citing *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 829 (1994)). "The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance." *Int'l Union, United Mine Workers of America*, 512 U.S. at 828 (internal quotations and citations omitted). In the

16-cv-3038-BTM-WVG

context of civil contempt, "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus 'carries the keys of his prison in his own pocket.'" *Id.* (internal quotations and citations omitted). Moreover, "[a] finding that a condemnor's misconduct was willful strongly supports granting attorney's fees and costs to the party prosecuting the contempt." *New York State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 96 (2d Cir. 1998); *see also Hutto v. Finney*, 437 U.S. 678, 691 (1978) ("[T]he award of attorney's fees for bad faith [may] serve[] the same purpose as a remedial fine imposed for civil contempt.").

The December 2018 OSC re Contempt warned Ms. Dostalik of the steps she may need to take to purge any finding of contempt, which included depositing into the Court's registry the AmTrust proceeds available to her in October 4, 2017 and July 2018. The Court also warned that if found in contempt, Ms. Dostalik may be immediately committed to the custody of the U.S. Marshall, or assessed a daily fine until she purges the contempt. Finally, the Court put Ms. Dostalik on notice that upon a finding of contempt, the Court could order Ms. Dostalik to pay Plaintiff's attorney's fees and costs incurred.

The Court hereby orders that to purge the contempt, Ms. Dostalik must:

1. Deposit the sum of $136,333.17[6] in the Court registry.

2. Deposit the sum of $551,750 in the Court registry.

3. Provide any documents or substantive information, documented or undocumented, regarding the disposition of and access to any income, accounts, investments, or proceeds relating to Caye International Bank, Rich Uncles, LLC, and cryptocurrency.

Ms. Dostalik has fourteen days from the entry of this Order to purge the

---

[6] This is the amount that Ms. Dostalik had in her possession on October 4, 2017 ($176,263.13), minus the amount from Ms. Dostalik's Caye Bank account that has already been deposited into the Court registry ($39,929.96), per the Court's Order Compelling Transfer of Funds on January 4, 2019 (See ECF No. 207).

contempt, or she will be committed to the custody of the U.S. Marshal.

Finally, because there is ample evidence that Ms. Dostalik violated Court orders willfully, the Court awards Plaintiff attorney's fees. Plaintiff may file a motion for attorney's fees within fourteen days.

## B. Preliminary Injunctions

Before the Court are also two temporary restraining orders, the August 8, 2018 TRO and the November 7, 2018 TRO. Those orders required Ms. Dostalik to show cause why preliminary injunctions should not issue having the same terms as the TROs.

"A preliminary injunction is an extraordinary and drastic remedy." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). A plaintiff seeking a preliminary injunction or a temporary restraining order must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) where applicable, an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).

Alternatively, "serious questions going to the merits and a balance of hardships can support issuance of a preliminary junction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted). Due to the exigent nature of a preliminary injunction, a court may consider hearsay and other evidence that would otherwise be inadmissible at trial. *See Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

"When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary

16-cv-3038-BTM-WVG

injunction.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009) (quoting *Bernhardt v. L.A. County*, 339 F.3d 920, 921 (9th Cir. 2003)).

### 1. August 8, 2018 TRO

As discussed above, the August 8, 2018 TRO enjoined Ms. Dostalik from transferring or disbursing funds relating to Caye Bank, Rich Uncles, and her cryptocurrency investments. This TRO is an extension of the Court's October 4, 2017 Injunction, the purpose of which was to prevent the disposition of AmTrust proceeds. Thus, for the same reasons outlined in the Court's order granting the October 4, 2017 Injunction, (see ECF No. 68 ("Order Granting Default Judgment and Preliminary Injunction"), 11-17), the Court grants a preliminary injunction with the same terms as the August 8, 2018 TRO. Plaintiff has already established likelihood of succeeding on the merits, and it has shown it would suffer irreparable harm in the absence of preliminary relief. Moreover, the balance of equities now tip even further in Plaintiff's favor. The evidence demonstrates that between June and September 2018, Ms. Dostalik deposited over $680,000 into Gemini Trust LLC. (Tr. May 21, 2019, 37:25-38:5.) Defendant has testified that all of this money was deposited into cryptocurrency, an investment that was lost during a hack. However, because the Court finds that Ms. Dostalik is not credible, this testimony carries little weight. As discussed above, Ms. Dostalik has continually violated Court orders since October 4, 2017. Thus, there is a clear and substantial likelihood that Ms. Dostalik still has access to over $680,000. Thus, preliminary relief is warranted.

### 2. November 7, 2018 TRO

On November 7, 2018, the Court ordered that:

In the event that the real property at 2201 Weld Blvd., El Cajon, CA, APN 386-652-33-00, is sold, the sales proceeds shall be paid to the registry of the United States District Court, Southern District of California after deducting:

    1.1 Any unpaid real property taxes and assessments then due and

owing;

1.2 All sums secured by the existing first mortgage;

1.3 Brokerage commission; and

1.4 Prorations, escrow fees and closing costs.

(November 7, 2018 TRO, 2.) Like the October 4, 2017 Injunction and the August 8, 2018 TRO, the purpose of the November 7, 2018 TRO was to prevent Ms. Dostalik from transferring funds. As discussed above, the Court has already held that Plaintiff has established likelihood of success on the merits. Plaintiff would be irreparably harmed in the event that Defendant sells the property and transfers the proceeds. Again, the balance of equities tips strongly in Plaintiff's favor, because Defendant has already failed to deposit over $725,000 of AmTrust proceeds in the Court registry and has testified that she no longer has access to this money. Thus, the Court grants a preliminary injunction.

//

## **CONCLUSION**

For the foregoing reasons, the Court **holds Defendant Diane Dostalik in civil contempt of the Court and grants Plaintiff's motions for preliminary injunctions (ECF Nos. 172, 194, 199.)**

The parties shall appear before the Court on July 15, 2019 at 3 pm for a status conference as to any purging of the contempt. In the absence of purging of the contempt, Ms. Dostalik shall then and there surrender to the U.S. Marshal to be confined until she purges her contempt.

IT IS SO ORDERED.

Dated: June 27, 2019

_Barry Ted Moskowitz_

Honorable Barry Ted Moskowitz
United States District Judge

16-cv-3038-BTM-WVG