UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ODYSSEY REINSURANCE COMPANY, a Connecticut corporation,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD KEITH NAGBY; DIANE NAGBY a.k.a. DIANE DOSTALIK; PACIFIC BROKERS INSURANCE SERVICES, a Nevada Corporation; CAL-REGENT INSURANCE SERVICES CORPORATION, a California corporation; CLAIMS TECHNOLOGY SERVICES CORPORATION, a California corporation; DAVID DOSTALIK,<br><br>Defendants. | Case No.: 16-cv-03038-BTM-WVG<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE**<br><br>**[ECF No. 165]** |

Plaintiff Odyssey Reinsurance ("Odyssey") moves for summary judgment, and in the alternative, for summary adjudication, on Plaintiff's fourth and ninth causes of action against Defendant Richard Nagby and Defendant Diane Dostalik, formerly known as Diane Nagby. (ECF No. 165 ("Pl.'s MSJ").) Along with its motion, Plaintiff has also filed a request for judicial notice. (ECF No. 165-

51 ("RJN").)  For the reasons discussed below, the Court **grants** Plaintiff's motion for summary judgment and **grants** Plaintiff's request for judicial notice. //

This action arises out of the judgment entered by the United States District Court for the District of Connecticut in favor of Plaintiff Odyssey Reinsurance Company ("Plaintiff" or "Odyssey") and against Defendant Cal-Regent Insurance Services Corporation ("Cal-Regent") in the amount of $3,200,000.00 plus interest.  (See RJN, Exs. 1-4.)  Cal-Regent was an insurance agency that underwrote certain insurance risks on behalf of State National Insurance Company ("State National").  *See Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, 123 F. Supp. 3d 343, 345-49 (D. Conn. 2015).  Plaintiff in turn reinsured State National for a certain percentage of those risks.  (Id.)  In accordance with a series of reinsurance agreements between the parties, Cal-Regent received a provisional commission—paid in part by Plaintiff—on all policies that it underwrote for State National.  (Id.)  At the end of each year, the provisional commissions were adjusted depending on the profitability of the business underwritten by Cal-Regent.  (Id.)  Where the provisional commission paid by Plaintiff exceeded the amount to which Cal-Regent was entitled to after the yearly adjustment, Cal-Regent was obligated to pay the difference to Plaintiff. (Id.)

Cal-Regent and Odyssey agreed to the amounts Cal-Regent reported as due and owing for the 2003, 2004, 2005, and 2007 underwriting years.  (ECF No. 41-3 ("Declaration of Lisa A. Keenan" or "Keenan Decl."), ¶ 12-13.)  Odyssey, however, contested the lower figure reported for the 2006 underwriting year.  (Id.)  Cal-Regent never paid the return commissions reported due to Odyssey on June 24, 2013.  (Id.)

Odyssey filed a lawsuit in the District of Connecticut to collect the amounts due from Cal-Regent.  (Id.)  In October 2015, the court rendered a judgment in

Plaintiff's favor and against Cal-Regent in the amount of $2,740,802.61. (RJN, Ex. 2.) In November 2015, the court awarded Plaintiff a supplemental judgment. (RJN, Ex. 4.) In addition to the October 2015 judgment, the court also awarded Plaintiff $459,197.39, bringing the judgment to a total sum of $3,200,000.00 plus interest. (Id.)

Defendants Richard Nagby and Diane Dostalik are both Cal-Regent's officers, directors, managers and shareholders. (Pl.'s MSJ, Exs. 503. 504.) Plaintiff contends that by early 2013, in order to avoid paying the amount of return commissions owing to Odyssey, Mr. Nagby and Ms. Dostalik "embarked on a plan to strip Cal-Regent of assets," (ECF No. 24, ("Second Am. Compl." or "SAC,") ¶ 30). Plaintiff alleges Mr. Nagby and Ms. Dostalik formed a Nevada corporation named Pacific Brokers Insurance Services ("PBIS"), transferred Cal-Regent's assets to PBIS for no equivalent value, sold PBIS to AmTrust North America, Inc. ("AmTrust") for $5 million, and then distributed the sale proceeds between the two of them. (Id. at ¶¶ 35-37.)

Here, Plaintiff seeks summary judgment only on its Uniform Fraudulent Transfer Act ("UFTA") claims brought under a theory of constructive fraud, which does not require any showing of fraudulent intent.[1] Thus, the relevant factual inquiry is whether Cal-Regent transferred its assets to PBIS without receiving reasonably equivalent value in exchange for these assets, notwithstanding what Mr. Nagby and Ms. Dostalik may or may not have intended.

Mr. Nagby and Ms. Dostalik sold PBIS to AmTrust in July 2015. (See Pl.'s MSJ., Ex. 99.) Of the sale proceeds ("the AmTrust proceeds"), AmTrust made an initial payment of $3 million to PBIS. (ECF No. 160-1, ¶¶ 3-4.) The remainder was to be paid in the form of contingent "earn out" payments in three annual

---

[1] An alleged violation of constructive fraud under the UFTA "focuses entirely on the transaction at issue and does not include elements of knowledge, intent, or purpose." *See Lachapelle v. Kim*, No. 15-CV-02195-JSC, 2015 WL 7753235, at *7 (N.D. Cal. Dec. 2, 2015) (internal quotations and citations omitted).

installments.  (ECF No. 165, Ex. 133, ¶ 3.)

As the only PBIS shareholders, Mr. Nagby and Ms. Dostalik decided how to allocate the AmTrust proceeds between the two of them during the course of their divorce proceedings.  *See In re: Marriage of: Diane M. Nagby v. Richard K. Nagby*, No. ED80574, in the Superior Court of California, County of San Diego. Per the "Stipulation and Order Re Division of PBIS Sale Proceeds and Outstanding Post-Judgment Issues" signed by the parties in May 2015, the two agreed that Ms. Dostalik would receive $2.5 million of the initial $3 million payment, while Mr. Nagby would receive the remaining $500,000.  *See id.*  They also agreed that Mr. Nagby would receive the earn out payments.  *Id.*

On August 4, 2015, Ms. Dostalik received $2.5 million, and Mr. Nagby received $500,000.  (ECF No. 140-3, Ex. 77; ECF No. 160-1, ¶ 14; ECF No. 165, Ex. 133 ¶¶ 2, 5.)  In October 2016, AmTrust wired the first earn out payment in the amount of $894.583.19 to a PBIS bank account.  (ECF No. 140-3, Ex. 543.) Mr. Nagby received those funds on October 21, 2016.  (ECF No. 140-3, Ex. 544.)

## PROCEDURAL BACKGROUND

Plaintiff filed the SAC on March 21, 2017, against several defendants, including Cal-Regent, PBIS, Mr. Nagby, and Ms. Dostalik, under several theories of liability, including the Uniform Fraudulent Transfer Act ("UFTA"), California's successor liability law, and principles of corporate law.  (SAC.)

On October 4, 2017, the Court granted Plaintiff's motion for the entry of a default judgment against Cal-Regent and PBIS in the amount of $3.2 million plus post-judgment interest.  (See ECF No. 68.)  The Court also granted Plaintiff a preliminary injunction against Mr. Nagby and Ms. Dostalik, restraining them from the dissipation of the AmTrust proceeds, including "all funds already received in connection with the sale of PBIS to AmTrust, and payments that are hereafter received from AmTrust."  (ECF No. 69 ("October 2017 Injunction Order".).)

On October 10, 2017, a stipulated order was entered directing AmTrust to

pay into the Court registry the second and third earn out payments. (See ECF No. 74 ("October 2017 Registry Order").) Plaintiff and AmTrust filed a joint motion to dismiss AmTrust without prejudice. (See ECF No. 84.) The dismissal order required that AmTrust continue to abide by the October 2017 Registry Order. (Id.) AmTrust has now deposited the second and third earn out payments, totaling $958,017.66, into the Court registry. (See ECF No. 223 ("Pl.'s Opp'n to Mot.-to-Interv."), 4:15-22.)

On October 27, 2017, the Court entered a judgment as to Cal-Regent and PBIS, including a monetary award against PBIS in the amount of $3,219,482.68, the amount owing on the District of Connecticut judgment against Cal-Regent. (ECF No. 82.) On March 5, 2018, the Court certified the judgment as final under Fed. R. Civ. P. 54(b). (ECF No. 105.) No appeal was taken.

On March 7, 2019, the Court denied a motion to intervene by third party Knight Insurance. (ECF No. 233.) On March 14, 2019, the Court granted a turnover motion in favor of Odyssey and directed payment of the AmTrust proceeds in the Court registry (the second and third earn out payments) to Odyssey. (ECF No. 234.) Knight Insurance has appealed both orders. (ECF Nos. 235, 236.) Mr. Nagby has appealed the order granting Plaintiff's turnover motion. (ECF No. 246.)

On April 22, 2019, the Court denied in part and granted in part a motion for summary judgment submitted by Defendants David Dostalik and Claims Technology Services Corporation ("CTS"). (ECF No. 253.) Defendants David Dostalik and CTS have appealed the order. (ECF Nos. 263, 264.)

The Court has issued a series of injunctions and temporary restraining orders requiring Ms. Dostalik to deposit AmTrust proceeds in her possession into the Court registry, starting with the Court's October 4, 2017 Injunction Order. The Court has held Ms. Dostalik in contempt for failing to comply.

Pretrial dates have been set, culminating in the final pretrial conference

16-cv-03038-BTM-WVG

scheduled for July 25, 2019.  Trial is scheduled to begin August 19, 2019.

## **STANDARD**

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 323 (1986).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to demonstrate that a genuine issue of disputed fact remains.  *Celotex*, 477 U.S. at 314.  The nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment."  *Anderson*, 477 U.S. at 255.

The standard for summary adjudication, also known as partial summary judgment, is the same as that for summary judgment.  *Lucent Techs. Inc. v. Gateway Inc.*, Nos. 02CV2060-B(CAB), 03CV0699-B(CAB), 03CV1108-B(CAB), 2007 WL 925514, at *1 n.1 (S.D. Cal. Mar. 19, 2007); *Mora v. Chem-Tronics,*

*Inc.*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998); *see also* Fed. R. Civ. P. 56(a).

## DISCUSSION

In the District of Connecticut action, the court held that Odyssey is a creditor of Cal-Regent and that Cal-Regent owes Odyssey a debt in the amount of $3.2 million plus interest. Plaintiff now seeks to recover from Defendants Richard Nagby and Diane Dostalik the money transferred to them from the sale of PBIS to AmTrust, under several theories of liability, including California's Uniform Fraudulent Transfer Act (UFTA), California successor liability law, and Nevada corporate law with respect to corporate distributions. Plaintiff claims that Mr. Nagby and Ms. Dostalik are liable based on the following alleged facts: (1) Cal-Regent transferred its assets to PBIS and was rendered insolvent; (2) PBIS then sold all of its assets to AmTrust; (3) the initial proceeds of the sale and the first earn out payment were distributed to the Mr. Nagby and Ms. Dostalik; (4) these distributions rendered Cal-Regent and PBIS insolvent in that they were left unable to pay off their creditors, specifically the debt owed to Odyssey.

Recovery on the basis of any theory hinges on the threshold question of whether Cal-Regent transferred its assets to PBIS. Thus, the Court begins by addressing whether there is a genuine dispute of material fact as to whether there was a transfer of assets from Cal-Regent to PBIS.

//

### A. Transfer of Assets from Cal-Regent to PBIS

Defendants argue that there was no transfer of assets from Cal-Regent to PBIS. Defendants propose that when Mr. Nagby assessed that the value of Cal-Regent's business was declining toward insolvency, he simply discontinued business operations and moved on to do business as PBIS. Plaintiff, however, has established undisputed facts showing that a transfer of Cal-Regent's business value did indeed occur.

Cal-Regent and PBIS shared the same business model. (See ECF No. 178-1 ("Richard Nagby Decl. in Opp'n"), ¶¶ 2, 3.) Both were general agents who underwrote insurance policies on behalf of insurance carriers. (Id.) Cal-Regent underwrote policies for a carrier called State National, while PBIS partnered with the carrier, CorePoint Insurance Company ("CorePoint"). (Id.) As part of the business practice, Cal-Regent and PBIS formed relationships with insurance brokerage companies (also referred to as producers) who would send insurance applications on behalf of independent insureds. (Id.) The policies sold by Cal-Regent or PBIS expired after twelve months, after which "renewal applications" would be solicited from insureds through the insurance brokers. (Id. at ¶ 10.)

Thus, the business value of Cal-Regent and PBIS consisted of the relationships they formed with insurance brokers and the policies they underwrote. As counsel for Mr. Nagby articulated during oral argument on February 28, 2019, the asset of general agents like Cal-Regent and PBIS is that they have a "product," a policy, that they administer and sell. However, the relationships with the insurance brokers are also assets, because without them, there would be no one to sell to. Moreover, not only do the relationships bear the fruit of whatever initial policies are solicited, they also provide the benefit of potential renewal applications. Mr. Nagby has testified that the rate at which policies renew is an important statistic and estimated that the renewal rate for Cal-Regent was about 80%. (Dep. Richard K. Nagby, 159:25-160:10.)

Plaintiff demonstrates that a transfer of assets between Cal-Regent and PBIS occurred with three factual bases. First, Plaintiff provides the expert report of Mr. Brian J. Bergmark, which analyzes and compares the insurance brokers that did business with both Cal-Regent and PBIS. Second, Plaintiff illustrates that Mr. Nagby, as he developed PBIS, solicited insurance brokers that formerly did business with Cal-Regent. Third, during the divorce proceedings of Mr. Nagby and Ms. Dostalik, the two stipulated to a judgment requiring them to

pay the creditors of Cal-Regent and PBIS. Together, these facts establish that there is no genuine dispute as to whether a transfer of assets occurred.

In Mr. Bergmark's report, he provides an analysis of the brokerage firms that sold policies for Cal-Regent and PBIS, as provided by Mr. Nagby, from July 1, 2012 through June 30, 2015. (Pl.'s MSJ, Decl. Brian J. Bergmark, Attach. Report, p. 12, Ex. K.) This analysis reflects that Cal-Regent underwrote policies for insureds brought in by about 490 brokerage firms. (See Id. at Ex. K.) Of this number, nearly 375 went on to do business with PBIS. (Id.) Accordingly, about 75% of the brokers with whom Cal-Regent developed relationships went on to form relationships with PBIS.

Moreover, Mr. Bergmark's report analyzes the list of producers attached as Schedule 4.20 to the purchase agreement for the sale of PBIS. (Id. at 12, Ex. L.) Schedule 4.20 itemized each producer with which PBIS had a broker agreement as well as the net premiums brought in by each producer. (Id.) From this list, Mr. Bergmark provides the following analysis: "The top 20 producers on the list, as provided by PBIS, account for $11.631 million of the $17.945 million written, or 65% of all premium income received. Of these 20 producers, 19 of them had policies underwritten by Cal-Regent as well as PBIS." (Id. at 13.)

Thus, Mr. Bergmark's report concludes that there was an effective transfer of the brokerage relationships from Cal-Regent to PBIS. (See id.)

In addition to Mr. Bergmark's report, Plaintiff also presents evidence that Mr. Nagby solicited brokerage firms with prior Cal-Regent relationships to produce policies for PBIS.

First, Mr. Nagby—either himself or outsourcing through his nephew's company, Meta-Data—solicited brokerage firms on behalf of PBIS when they contacted Cal-Regent with policy requests from new insureds during the time when Cal-Regent was no longer binding policies. For example, during Mr. Nagby's deposition, Plaintiff's counsel questioned him about transitioning

16-cv-03038-BTM-WVG

from operating Cal-Regent to PBIS, during which Cal-Regent eventually stopped binding policies. (Dep. Richard K. Nagby, 161:17-162:22.) Counsel specifically asked Mr. Nagby what would happen "during this transition period when Cal-Regent was contacted by a broker on behalf of a new insured, one that didn't already have an existing State National policy." (Id. at 162:3-9.) Counsel asked whether Cal-Regent would issue the policy or whether PBIS would handle the application. (Id.) Mr. Nagby responded with the following answer:

> There's so many instances, there's no general rule. And it wouldn't be Cal-Regent handling it at this point. It would have been Meta Data people handling it and deciding where it would go, based on whenever they wanted to do with it. . . . And since we were non-renewing—the State National policies, it would seem that the logical thing would be to write with Pacific Brokers because it wouldn't make sense to begin—continue to populate a potential problem that could be lost at any time.

(Dep. Richard K. Nagby, 162:10-22.) With this testimony, Mr. Nagby confirmed that during the time when Cal-Regent had ceased binding policies, rather than turn away new insureds because Cal-Regent was closing its doors, "*the logical thing would be to write with Pacific Brokers*." (Id. at 162:18-19 (emphasis added).)

In addition to Mr. Nagby's deposition testimony, there is also evidence in his declaration that Mr. Nagby, on behalf of PBIS, solicited brokers who had formerly sent policy applications to Cal-Regent:

> In consideration of the fact that I knew that the loss ratio was untenable with Cal-Regent and State National, I decided to nonrenewed [sic] all of the existing policies with Cal-Regent. That would require that I remarket them anew with CorePointe after the policies expired with Cal-Regent/State National and they were up for renewal.
>
> I knew in my memory the identity of the various insurance brokers that I dealt with under the Cal-Regent and State National program and began contacting them requesting that they send not only

16-cv-03038-BTM-WVG

renewal applications that they might've sent to Cal-Regent (which they couldn't because the business had been nonrenewed) and asking if they send new business applications as well potential [sic] that [sic] nothing to do with business placed with Cal-Regent or State National.

Everything solicited by PBIS was only a potential, possible future sale of an insurance policy. The policies were not renewed with PBIS as it was using a different insurance carrier. The policies were considered new business by the new insurance carrier CorePointe and would have to be underwritten, quoted, bound and the policies issued accordingly. In effect, PBIS had to seek out all new future business and persuade the brokers and their insureds to go with the new company that they did not know.

("Richard Nagby Decl. in Opp'n"), ¶¶ 33-35.)  While Mr. Nagby stressed that in reaching out to brokers as PBIS, he solicited applications for first-time applications rather than renewal applications, his testimony reflects that he relied on the list of brokerage firms that previously had relationships with Cal-Regent. Mr. Nagby testified that he knew the identity of the nearly 375 various brokers that went on to do business with PBIS "from memory."  Even if true, his testimony also makes clear that the compilation of the firms had been developed during the course of Cal-Regent's business operations: "I knew in my memory the identity of the various insurance brokers *that I dealt with under the Cal-Regent and State National program*."  (Id. at ¶ 34 (emphasis added).)

Moreover, there is also evidence that Mr. Nagby, with the participation of Mr. Dostalik, strategized on how best to structure the transition of Cal-Regent dissolving and PBIS starting so as not to cause their insurance brokers "confusion" and "uncertainty" in the process.  (See ECF No. 177 ("Pl.'s Opp'n to Defs.' MSJ"), Ex. 816, p. 2.)  An instant message exchange on July 12, 2013 includes in relevant part (quoted as appears):

David Dostalik [9:18 AM]:

Can Corepoint transact business with both Cal-Regent and Pacific

16-cv-03038-BTM-WVG

Brokers?

Rick K. Nagby [9:18 AM]:

no / contract is with pacific / not with cal regent / I could chnage that if we want to / but would like ot keep it separate

David Dostalik [9:23 AM]:

It's going to be unsettling enough to switch carriers.  Would be easier to change carriers first and then a little later change GA's,[2] less confusion and uncertainty for the brokers and easier on us.  They They wouldn't be as leery as a sudden change in GA and carrier at the same time

Rick K. Nagby [9:24 AM]:

it woon't be sudden / gradual / no stop date for state national until we decide to stop / gradula migration / gradual

Rick K. Nagby [9:29 AM]:

I will make it so slow no one will know / that ismy new RAP lyric

David Dostalik [9:23 AM]:

Ha ha, good one / OK, we will probably need to talk to each broker individually before switching them so they know what is going on.

(Id.)  This conversation and Mr. Nagby's testimony quoted above demonstrate that the overlap of the 75% of Cal-Regent brokers that went on to form relationships with PBIS was not merely a manifestation of the niche area of insurance within which Cal-Regent and PBIS operated. Rather, Mr. Nagby took steps to transfer the broker relationships from Cal-Regent to PBIS.

Finally, there is evidence that Mr. Nagby and Ms. Dostalik believed and understood that the debts of Cal-Regent would be paid by PBIS.  In a

---

[2] By "GAs," Dostalik was referring to "general agencies," i.e., Cal-Regent and PBIS.

stipulated judgment in the divorce proceedings of Mr. Nagby and Ms. Dostalik, the two agreed that "[t]he legal fees of debts of Cal-Regent shall be taken out of each parties' distribution from PBIS until sold at which point each party shall be responsible for payment of half of any legal fees or outstanding debts of Cal-Regent." (RJN, Ex. 26, 7:7-9.) This admission by Defendants reflects that a transfer of assets from Cal-Regent to PBIS did in fact occur; otherwise, Defendants would not have agreed to pay Cal-Regent's debts with proceeds from the sale of PBIS to AmTrust.

With the evidence discussed above taken together, Plaintiff has established that even when viewing all inferences drawn from the underlying facts in the light most favorable to Defendants, there is no genuine dispute as to whether there was a transfer of assets from Cal-Regent to PBIS. Indeed, the evidence reflects that Cal-Regent transferred at least 75% of its most valuable resource: its relationships with insurance brokerage firms. Defendants' attempts in demonstrating that a factual dispute remains amount to no more than simply denying that a transfer occurred. Thus, Defendants have not presented specific facts showing that there is a genuine issue for trial with respect to whether a transfer of assets from Cal-Regent to PBIS occurred. Accordingly, the Court moves on to discuss whether this transfer of assets may be the basis for holding Mr. Nagby and Ms. Dostalik liable for the amount transferred to them from the PBIS sale proceeds.

//

### B. Recovery Under the UFTA

Plaintiff first argues that it may recover from Mr. Nagby and Ms. Dostalik under the UFTA because the transfer of assets from Cal-Regent to PBIS was fraudulent, rendering PBIS liable for the debts of Cal-Regent, and when PBIS distributed the AmTrust proceeds to Mr. Nagby and Ms. Dostalik, it was rendered insolvent.

Under California state law, "[a] fraudulent conveyance is 'a transfer by the debtor of the property to a third person undertaken with the intent to prevent a creditor from reaching the interest to satisfy its claim.'" *Lachapelle v. Kim*, No. 15-CV-02195-JSC, 2015 WL 7753235, at *4 (N.D. Cal. Dec. 2, 2015) (quoting *Yaesu Elecs. Corp. v. Tamara*, 28 Cal. App. 4th 8, 13 (1994)). Under California's Uniform Fraudulent Transfer Act ("UFTA"),[3] a Plaintiff may seek relief from a fraudulent transfer based on a theory of actual fraud under Cal. Civ. Code § 3439.04(a)(1) or constructive fraud under either § 3439.04(a)(2) or § 3439.05. *See Freitag v. Wang*, No. 2:15-CV-2147-JFW-MRW, 2015 WL 7737301, at *3-4 (C.D. Cal. Dec. 1, 2015) (citing Cal. Civ. Code § 3439.04(a)); *Donell v. Kowell*, 533 F.3d 762, 770-771 (9th Cir. 2007); *Lachapelle*, 2015 WL 7753235, at *7.

Plaintiff brings its motion for summary judgment seeking to hold Mr. Nagby and Ms. Dostalik liable under a theory of constructive fraud only. Under § 3439.04(a)(2) or § 3439.05, a transfer is voidable as to an existing creditor if the debtor does not receive reasonably equivalent value and was insolvent at the time of the transfer or became insolvent as a result. *Lachapelle v. Kim*, 2015 WL 7753235, at *7. Plaintiff argues that the distribution of the AmTrust proceeds to Mr. Nagby and Ms. Dostalik is voidable because Plaintiff was a creditor of PBIS before the distribution occurred and because the distribution left PBIS insolvent. The Court agrees.

### 1. Odyssey Was a Creditor of PBIS Before the Distribution of the AmTrust Proceeds

Plaintiff argues that it gained the status of a PBIS creditor when PBIS began to operate after receiving the transfer of Cal-Regent's assets. Plaintiff

---

[3] Cal. Civ. Code § 3439.14(a) provides that the amendments updating California's fraudulent conveyance statute to conform to the changes in the Uniform Fraudulent Transfer Act "apply only to a right of action that accrued . . . on or after [January 1, 2016]." Plaintiff alleges that the facts giving rise to this lawsuit all occurred prior to January 1, 2016. Thus, the Court cites to the statutory language in effect during the period from 2013 to 2015.

16-cv-03038-BTM-WVG

proposes that its creditor status is established under three theories: (a) the transfer of Cal-Regent's assets to PBIS was fraudulent and voidable under the UFTA, (b) PBIS became Cal-Regent's successor as it was a mere continuation of Cal-Regent's business, and (c) this Court's order granting Plaintiff default judgment against PBIS deems Plaintiff a creditor of PBIS.

### a.    UFTA

Plaintiff argues that under the UFTA's standard for constructive fraud, the transfer of Cal-Regent's assets to PBIS was fraudulent and therefore voidable as to Cal-Regent's creditors.  Under the UFTA, Plaintiff must demonstrate that (1) it was a creditor of Cal-Regent before the transfer of assets to PBIS occurred, and (2) the transfer left Cal-Regent insolvent or that Cal-Regent received no reasonably equivalent value and was insolvent at the time of the transfer.  *See Lachapelle v. Kim*, 2015 WL 7753235, at *7.  As discussed above, the District of Connecticut judgment held that Odyssey was a creditor of Cal-Regent based on a debt that accrued prior to the incorporation of PBIS.  *See Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, No. 3:14-cv-00458-VAB, 2015 WL 5971580, at *2-5 (D. Conn. Oct. 14, 2015).  Moreover, Defendants do not contend that Cal-Regent received anything of value from PBIS or any other entity in exchange for any of its assets.  Finally, even while disputing that a transfer of assets took place, Mr. Nagby has conceded that Cal-Regent was insolvent or nearing insolvency at or around the time that PBIS began operating.  As defense counsel explained during oral argument on February 28, 2019, Mr. Nagby simply stopped doing business as Cal-Regent and formed PBIS.  Defense counsel went on to state that during the time that Mr. Nagby was transitioning from Cal-Regent to PBIS, he was not concerned with Odyssey pursuing Cal-Regent's assets since soon Cal-Regent would no longer have any assets.

Defendants do argue, however, that any transfer of assets that may have occurred is not covered by the constructive fraud provision of the UFTA.

Defendant Mr. Nagby argues that the only valuable asset of Cal-Regent and PBIS was Mr. Nagby himself, an asset that could not be fraudulently transferred from one corporation he owned to another.  Mr. Nagby argues that this is reflected in the fact that when AmTrust purchased the assets of PBIS, the purchase was for a noncompete agreement with Mr. Nagby.  The evidence for this proposition is found in Mr. Nagby's declaration:

> The true crux of the agreement between AmTrust and PBIS was the need for AmTrust to make sure that I personally did not compete with them in the garage liability market that they wanted to enter into by making the deal with PBIS. They also needed to have me supervised [sic] the running of the insurance operation and consult with them from time to time. Otherwise I could just go out and begin marketing my own garage liability insurance program.

("Richard Nagby Decl. in Opp'n"), ¶ 53.)  In support of this testimony, Mr. Nagby provides an employment agreement between himself and AmTrust ("Employment Agreement"), which among other terms of employment, includes a section entitled, "Non-Solicitation; Non-Competition."  (Id. at Ex. D, ¶ 11.)

The purchase agreement itself between PBIS and AmTrust, however, nowhere references that the "true crux" of AmTrust's purchase was for a noncompete agreement with Mr. Nagby.  First, Mr. Nagby himself is not a distinct party to the agreement for the sale of PBIS.  The contract that governs the purchase is entitled "Renewal Rights and Asset Purchase Agreement by and between AmTrust North America, Inc. and Pacific Brokers Insurance Services Corporation" ("Purchase Agreement").  (See Pl.'s MSJ., Ex. 99 p. 1.)  The Purchase Agreement states in its first provision that the contract was "made and entered into" and "by and between" "Pacific Brokers Insurance Services Corporation, a Nevada corporation ('Seller'), and AmTrust North America, Inc., a Delaware corporation ('Buyer')."  (Id. at 4.)  While Mr. Nagby is a signatory to the contract, it is in his capacity as a representative of PBIS.  (Id. at 31.)

Second, while there is a covenant not to compete in the agreement, the

provision refers only to "Seller" and "Buyer," which as discussed above, refers to PBIS and AmTrust, respectively.  (Id. at 26-27.)  The provision does not reference Mr. Nagby himself, and the language indicates that "Seller" refers to the corporation of PBIS, rather than for any individual, as the pronoun "its" is repeatedly used.  (Id.)  The provision also in no way appears to be the "crux" of the agreement.  It takes up just over one page in a nearly thirty-page agreement and is slotted in toward the end under a section called "Article VI Additional Agreements."  (Id. at 21.)

The true crux of the agreement is what is detailed within a section called "Article II Purchase and Sale of Purchased Assets," under which "non-compete or non-solicitation agreement with employees and agents of Seller" is just a subpart of one subsection included in the definition for "Purchased Assets."  (Id. at 9-12.)  Notably, the "Purchased Assets" also include "renewal rights," "all right, title and interest of Seller to the products of the Business, and lists of Producers and Policyholders relating thereto," "copies of all books and records of Seller relating to the Purchased Assets and the Insurance Contracts, including all claims data relating to the Insurance Contracts," "Seller's interest in and to all telephone numbers, telephone facsimile numbers and other directory listings utilized in connection with the Business," and "all goodwill and other intangible assets associated with the Business."  (Id. at 10.)

Finally, there is no evidence to support the proposition, nor does Mr. Nagby argue, that the Purchase Agreement and the Employment Agreement reference one another or are meant to be taken together as one contract.  Rather, each exists as a discrete entity, with their own separate terms, definitions, and signature pages.  Moreover, both the Purchase Agreement and the Employment Agreement are dated July 2, 2015.  (See Pl.'s MSJ, Ex. 99; Richard Nagby Decl. in Opp'n"), Ex. D).  Thus, there is no evidence, other than the testimony in Mr. Nagby's declaration, that the Purchase Agreement was in any way dependent or

conditioned upon the Employment Agreement.

Consequently, Defendants fail to raise a dispute of material fact regarding the issue of what assets AmTrust purchased in the sale of PBIS.

Defendants also argue that any other assets that may have been transferred are not property under the UFTA and so cannot be the basis for a claim of fraudulent transfer. Specifically, Defendants dispute Plaintiff's claim that Cal-Regent transferred a "book of business" to PBIS because Cal-Regent never transferred any of the actual policies underwritten on behalf of State National, in part evidenced by the fact that Cal-Regent did not renew its policies.

As discussed in Part A, the evidence presented establishes that a transfer of assets occurred from Cal-Regent to PBIS in the form of relationships with insurance brokerage firms. These "relationships" are in part tangible assets—a list of names and contact information—and in part intangible—goodwill and the potential for future business. Thus, the Court examines whether a transfer of a list of brokerage firms, along with goodwill and potential for future business, may be the assets of a fraudulent transfer under the UFTA.

"For purposes of fraudulent transfer, an 'asset' is 'property of a debtor,' and property means 'anything that may be the subject of ownership.'" *Powertech Tech., Inc. v. Tessera, Inc.*, No. C 11-6121 CW, 2014 WL 171830, at *11 (N.D. Cal., 2014) (citing Cal. Civ. Code §§ 3439.01(a), (h)). Plaintiff cites a number of bankruptcy cases[4] ruling that intangible assets can be the subject of a fraudulent transfer, including a "book of business," corporate goodwill, or ongoing business concern. *See In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 571 (9th Cir. 2012) (holding that the "transfer of an ongoing business concern" in the form of

---

[4] The Ninth Circuit has held that "bankruptcy case law may be persuasive in considering California statutes that are substantially similar, including California's fraudulent transfer statute." *Powertech Tech., Inc.*, 2014 WL 171830, at *11 (citing *In re AFI Holding, Inc.*, 525 F.3d 700, 703 (9th Cir. 2008)).

16-cv-03038-BTM-WVG

the insurance firm's biggest client constituted a fraudulent transfer); *see also In re Watman,* 301 F.3d 3, 12 (1st Cir. 2002) ("There is substantial support in bankruptcy case law for the proposition that such intangible assets as goodwill and overall going concern are valuable."); *Hunt v. Phinney*, 177 Cal. App. 2d 212, 216 (1960) ("It has been repeatedly held that the goodwill of a business is property and as such will be protected by the courts.").

Defendants have argued that the cases cited by Plaintiff are inapposite, because Cal-Regent, as a general agent, did not have any "customer lists," since it did not serve any insureds directly. This, however, is a semantic difference. Cal-Regent and PBIS had relationships with insurance brokerage firms. They solicited brokers and worked with them to provide policies for insureds. Whether the list of those firms is called a "customer" list or a "client" list or a "business relationships" list makes no difference under the UFTA.

Defendants also argue that no asset was fraudulently transferred to PBIS because there was no guarantee that any brokerage firm would agree to do business with PBIS. In other words, PBIS did not receive any "renewal" rights from Cal-Regent. This may be true but not relevant for the purpose of establishing constructive fraud under the UFTA; there is certainly more value in soliciting business based on a former relationship than starting from scratch. *See Powertech Tech., Inc.*, 2014 WL 171830, at *11 (holding that a business relationship may be the subject of a fraudulent transfer "even though [the party in the relationship] could go elsewhere at any time" because "having that relationship is undoubtedly an asset to [the counterclaim defendant's] business").

Accordingly, assets such as Cal-Regent's list of brokerage firms, along with goodwill and the potential for future business, is among the type of assets that can be fraudulently transferred under the UFTA.

Plaintiff has thus established that under a theory of constructive fraud, a fraudulent transfer occurred when Cal-Regent transferred its assets to PBIS, and

16-cv-03038-BTM-WVG

Odyssey is entitled to recover a judgment against PBIS in an amount equal to the value of the asset transferred, not to exceed the amount of Odyssey's claim. *See* Cal. Civ. Code. § 3439.08.  Thus, Odyssey has shown that it became a creditor of PBIS prior to any distributions of the AmTrust proceeds.

### b. Successor Liability

Plaintiff also argues that it has demonstrated its status as a PBIS creditor under California's standard for successor liability.  Under California law, a corporation that purchases all of the assets of another corporation is not liable for the former corporation's liabilities unless, "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts."  *Ray v. Alad Corp.*, 19 Cal. 3d 22, 28 (1977).  Although successor liability often refers to formal purchases, courts have extended liability to transfers of assets as well.  *See Stoumbus v. Kilimnik*, 988 F.2d, 949 961 (interpreting Washington law and stating that successor liability can extend to "transfers other than straightforward purchases"); *see also Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1327 (2012) (sustaining a jury's finding of successor liability where there was no formal purchase of assets of another corporation, but instead where a corporation which established a separate line of business assigned leases for that businesses' equipment to another corporation).  To prevail on a theory of "mere continuation," a plaintiff must show one or both of the following factual elements: "(1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations."  *Ray*, 19 Cal. 3d at 29.

"As with other equitable doctrines, it is appropriate to examine successor

16-cv-03038-BTM-WVG

liability issues on their own unique facts and considerations of fairness and equity apply." *Cleveland*, 209 Cal. App. 4th at 1330 (internal citations omitted). Thus, the significant principle is that "'if a corporation organizes another corporation with practically the same shareholders and directors, transfers all of the assets but does not pay all the first corporation's debts, the separate entities may be disregarded and the new corporation held liable for the obligations of the old.'" *Id.* at 1334 (quoting *McClellan v. Northridge Park Townhouse Owners Ass'n*, 89 Cal. App. 4th 746, 753 (2001)).

As already discussed above, Plaintiff has established that PBIS did not pay adequate consideration for the transfer of Cal-Regent's assets and that both corporations were owned, operated, and managed by Mr. Nagby.

Accordingly, Plaintiff has established that it became a creditor of PBIS upon the transfer of Cal-Regent's assets because PBIS was a mere continuation of Cal-Regent's business and thus liable for Cal-Regent's debts as its successor.

### c. Default Judgment

Plaintiff is also a judgment creditor of PBIS in the full amount owing on the District of Connecticut judgment, per this Court's order granting default judgment against Defendant PBIS on October 4, 2017. (See ECF Nos. 68, 82.) On March 5, 2018, the Court certified the judgment as final under Fed. R. Civ. P. 54(b). (ECF No. 105.) No appeal was taken. No motion to set aside the judgment under Fed. R. Civ. P. 60(b) has been made.

Plaintiff argues that its status as a judgment creditor of PBIS satisfies that creditor status requirement under the UFTA, because even though this Court's order granting default judgment was entered after the distributions of the AmTrust proceeds were made, the Court's ruling was based on facts that all took place prior to the distributions.

The UFTA distinguishes between present and future creditors. Whereas both present and future creditors may avoid fraudulent transfers based on a

16-cv-03038-BTM-WVG

theory of fraudulent intent, it is less clear whether a future creditor could prevail under a theory of constructive fraud. *See Meija v. Reed*, 31 Cal. 4th 657, 664 (2003). Nonetheless, even if Plaintiff may not recover under the UFTA based on its status as a judgment creditor of PBIS, Plaintiff has already established its creditor status under the UFTA and successor liability, as discussed above.

### 2. The Distribution of the AmTrust Proceeds Rendered PBIS Insolvent

To hold Mr. Nagby and Ms. Dostalik liable under the UFTA for the amount owing on the Connecticut judgment, Plaintiff must also demonstrate that the distribution of the AmTrust proceeds rendered PBIS insolvent. Defendants do not dispute that the only asset of PBIS consisted of its business operations as a general agent. PBIS then sold this asset for cash during the sale to AmTrust. PBIS received $5 million during the sale and initially distributed $2.5 million to Ms. Dostalik and $500,000 to Mr. Nagby. This distribution rendered PBIS insolvent, because it left PBIS unable to pay the debts owing to its creditors, notably Odyssey. As the distributions to Mr. Nagby and Ms. Dostalik left PBIS with no more than $2 million in future earn out payments, PBIS was rendered unable to pay the full amount owing on the District of Connecticut judgment. Plaintiff also points out that when Mr. Nagby withdrew the first earn out payment from a PBIS bank account, PBIS had been insolvent since the initial distributions. None of these facts are actually disputed by Defendants. Mr. Nagby only argues that at the time the distributions occurred, he did not believe that PBIS owed a debt to Odyssey. However, under a theory of constructive fraud, what Mr. Nagby may or not have intended by causing the distributions to occur is not relevant. *See Lachapelle v. Kim*, 2015 WL 7753235, at *7 (internal quotations and citations omitted) ("[A]n alleged violation of section 3439.05 does not sound in fraud, because the claim focuses entirely on the transaction at issue and does not include elements of knowledge, intent, or purpose.").

16-cv-03038-BTM-WVG

Thus, the Court holds that under the UFTA, Odyssey has established that no genuine dispute of material fact exists as to its status as a PBIS creditor before the distributions of the AmTrust proceeds that rendered PBIS insolvent. Consequently, Odyssey is entitled to judgment as a matter of law under the UFTA on the fourth cause of action.

### 3. Damages

Under the UFTA, "[i]n an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 3439.08, may obtain: (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." Cal. Civ. Code § 3439.07(a). Section 3439.08 provides: "[T]o the extent a transfer is voidable in an action by a creditor under . . . Section 3439.07, the creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less." Cal. Civ. Code § 3439.08.

The transfer sought to be avoided by Odyssey is the payment of the AmTrust proceeds to Mr. Nagby and Ms. Dostalik. No genuine dispute of fact exists as to the "value of the asset transferred" which was simply the value of the distributions that Mr. Nagby and Ms. Dostalik received. Odyssey is therefore entitled to a money judgment under the UFTA, against Diane Dostalik in the amount of $2,500,000.00, and against Richard Nagby in the amount of $1,394,583.19, plus prejudgment interest, as discussed below.

### 4. Prejudgment Interest

In the Ninth Circuit, "[t]he recognized general rule is that state law determines the rate of prejudgment interest in diversity actions." *Northrop Corp. v. Triad Int'l Mktg, S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988). "Under California law, a litigant is entitled to prejudgment interest (at 7%), as a matter of law when his claim is for a liquidated sum or for a sum which is 'capable of being made certain by calculation.'" *In re Consol. Pretrial Proceedings in Air W. Sec. Litig.,*

16-cv-03038-BTM-WVG

436 F. Supp. 1281, 1286 (N.D. Cal. 1977).  Prejudgment interest "is available 'as a matter of right,' rather than at the discretion of a court."  *Diaz v. Kubler Corp.*, 785 F.3d 1326, 1329 (9th Cir. 2015) (internal citations omitted).

Thus, the Court's judgment against Mr. Nagby and Ms. Dostalik based upon the distributions of the AmTrust Proceeds must include prejudgment interest at the rate of 7% per annum.  As to Diane Dostalik, interest is computed on $2,500,000.00 from August 4, 2015.  As to Richard Nagby, interest on $500,000.00 has accrued from August 4, 2015, and interest on $894,583.19 has accrued from October 21, 2016.

//

## C. Recovery Under Nevada Corporate Law

Plaintiff also argues that it may recover the full amount owing on the District of Connecticut judgment from Mr. Nagby under Nevada corporate law.  Under the Nevada Revised Statutes regulating distributions to stockholders:

> 1. Except as otherwise provided in subsection 2 and the articles of incorporation, a board of directors may authorize and the corporation may make distributions to its stockholders, including distributions on shares that are partially paid.
> 2. No distribution may be made if, after giving it effect:
>     (a) The corporation would not be able to pay its debts as they become due in the usual course of business; or
>     (b) Except as otherwise specifically allowed by the articles of incorporation, the corporation's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the corporation were to be dissolved at the time of distribution, to satisfy the preferential rights upon dissolution of stockholders whose preferential rights are superior to those receiving the distribution.

Nev. Rev. Stat. § 78.288.  Plaintiff argues that because the distributions of the AmTrust proceeds to Mr. Nagby and Ms. Dostalik rendered PBIS insolvent, the distributions were unlawful under this provision of Nevada corporate law.

As discussed above, Plaintiff has already established that it was a creditor of PBIS before the distributions occurred. Moreover, Plaintiff has already shown that the distributions rendered PBIS insolvent.

Thus, the Court holds that the distributions were unlawful under § 78.288(2)(a) because they left PBIS unable "to pay its debts as they became due in the usual course of business," and under § 78.288(2)(b) because they left PBIS with assets "less than the sum of its total liabilities."

Plaintiff seeks to hold Mr. Nagby liable for the unlawful distributions under Nevada Revised Statutes § 78.300, which states:

1. The directors of a corporation shall not make distributions to stockholders except as provided by this chapter.
2. Except as otherwise provided in subsection 3 and NRS 78.138, in case of any violation of the provisions of this section, the directors under whose administration the violation occurred are jointly and severally liable, at any time within 3 years after each violation, to the corporation, and, in the event of its dissolution or insolvency, to its creditors at the time of the violation, or any of them, to the lesser of the full amount of the distribution made or of any loss sustained by the corporation by reason of the distribution to stockholders.

Nev. Rev. Stat. § 78.300.

Plaintiff presents the "Minutes of Special Meeting of Shareholders and Board of Directors or Pacific Brokers Insurance Services," dated August 4, 2015, during which the PBIS adopted the resolution to distribute $2.5 million of the AmTrust proceeds to Ms. Dostalik and $500,000 to Mr. Nagby. (See ECF No. 160-3, Ex. B.) The minutes also approve the payment of all earn-out payments to Mr. Nagby. (Id.) The minutes were signed by Mr. Nagby as "Shareholder and Director." (Id.)

Because Mr. Nagby, acting as the director of PBIS, made the unlawful distributions of the AmTrust proceeds, he is liable to Odyssey, as a creditor of PBIS at the time of the violation, "to the lesser of the full amount of the distribution made or of any loss sustained by the corporation by reason of the

distribution." Nev. Rev. Stat. § 78.300. The distributions together amount to $3,894.583.19, which includes the initial distributions and the first earn out payment. The "loss sustained by the corporation" includes the debt PBIS owes to Odyssey in the unsatisfied amount owing on the District of Connecticut judgment, which is at most $3,200,000.00 plus interest.

Therefore, Odyssey is entitled to a money judgment under the Nevada Revised Statutes, against Richard Nagby in the full unsatisfied amount owing on the District of Connecticut judgment.

//

## REQUEST FOR JUDICIAL NOTICE

Plaintiff requests that the Court take judicial notice of filings in *Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, No. 3:14-cv-00458-VAB (D. Conn. 2015) and *In re: Marriage of: Diane M. Nagby v. Richard K. Nagby*, No. ED80574, in the Superior Court of California, County of San Diego. (See RJN.) The Court takes judicial notice of the filings and grants Plaintiff's request for judicial notice.

//

## CONCLUSION

For the reasons discussed above, Plaintiff Odyssey Reinsurance Company's motion for summary judgment (ECF No. 165) is **granted** on the fourth cause of action**,** against Diane Dostalik, formerly known as Diane Nagby, in the amount of $2,500,000.00 plus pre-judgment interest at a rate of 7% per annum from August 4, 2015, and against Richard Nagby in the amount of $500,000 plus prejudgment interest at a rate of 7% per annum from August 4, 2015 and $894,583.19 plus prejudgment interest at a rate of 7% per annum from October 21, 2016, pursuant to California state law. Plaintiff's motion is **granted** on the ninth cause of action, against Richard Nagby, in the full unsatisfied amount owing on the District of Connecticut judgment, under Nevada state law.

16-cv-03038-BTM-WVG

While Plaintiff asserts that it moves for summary judgment on causes of action two, four, nine, eleven, and thirteen, the motion only seeks judgment against Mr. Nagby and Ms. Dostalik to avoid transfers made for less than reasonably equivalent value (cause of action four, see SAC ¶¶ 68-71) and to recover unlawful corporate distributions by PBIS (cause of action nine, see SAC ¶¶ 92-98).[5] Thus, the Court makes no ruling as to causes of action two, eleven, and thirteen.

The Court **grants** Plaintiff's request for judicial notice. (ECF No. 165-51.)

**IT IS SO ORDERED**.

Dated: July 2, 2019

Honorable Barry Ted Moskowitz
United States District Judge

---

[5] The Court assumes that there are two typos on page 10 of Plaintiff's memorandum in support of its motion for summary judgment. (See ECF No. 165-1 at page 10.) Based on the SAC, the Court infers that the second bullet point on page 10 refers to the fourth cause of action (not the ninth) and that the third bullet point refers to the ninth cause of action (not the seventh).

16-cv-03038-BTM-WVG